OMAHA & REPUBLICAN VALLEY RAILWAY COMPANY V.
JAMES B. TALBOT.

FILED MAY 20, 1896. No. 6579.

48    627
48    658
48    627
f49   496
51    760
53    739
48    627
59    234

1. Railroad Companies: COLLISION AT CROSSING: INJURY TO OCCUPANT OF WAGON: NEGLIGENCE OF DRIVER. Two mechanics were riding in a wagon in which they were transporting their tools, one driv-ing the team. The driver, without looking or listening for the approach of a train, drove on a railroad crossing where a collision

with a locomotive engine occurred injuring the other mechanic. It did not appear that the injured person was under any disability whatever, nor whether or not he looked or listened. *Held*, (1) That the conveyance being a private one the driver was the agent of the injured person; (2) if the act of the driver in going upon the crossing without looking and listening was negligence which contributed to the injury received, the injured person cannot recover.

2. ———: Danger at Crossings: Injury to Negligent Traveler: Recovery. It is the duty of a traveler upon a public highway when approaching a railroad crossing to exercise ordinary care, and if he fails to do so and is injured at the crossing by a collision with an engine, and his failure to exercise ordinary care contributed to such injury, he cannot recover therefor.

3. ———: ———: Notice. A railroad crossing is a place of danger, and all persons, to whom negligence may be imputed, are bound to take notice of that fact.

4. ———: ———: Failure to Look and Listen for Train. The act of a party in going upon a railroad crossing without first listening and looking for the approach of a train, without a reasonable excuse therefor, is such as permits of no other inference than that of negligence; and if such failure to look and listen contributes to the party's injury he cannot recover.

5. ———: Trains: Schedule Time: Negligence. The mere running of a train behind its schedule time is not evidence which tends to prove negligence.

6. ———: Speed of Trains. Outside the limits of cities, villages, and towns, negligence cannot be imputed to a railroad company solely by reason of the speed of its train, however great.

7. ———: Signals at Crossings: Negligence. The failure of a railroad company to cause a bell to be rung or a whistle to be sounded as its engine approaches a crossing is evidence which tends to prove negligence on the part of the railroad company, but does not necessarily demand an inference of negligence.

8. ———: ———: Injury to Traveler: Negligence: Proximate Cause. To recover for an injury alleged to have been sustained at a railroad crossing by a collision with an engine on account of the neglect of the railroad company to cause a bell or whistle to be sounded as its engine approached such crossing, it is not enough for the injured person to show that he was injured at the crossing, and that no signal of a bell or whistle was given, and that such default of the railroad company was negligence; but, to recover, the injured person must further show that the default and negligence of the railroad company were the proximate cause of the injury sued for.

ERROR from the district court of Boone county.   Tried below before THOMPSON, J.

*John M. Thurston, W. R. Kelly,* and *E. P. Smith,* for plaintiff in error.

*M. W. McGann* and *M. F. Harrington, contra.*

References: *Piper v. Chicago, M. & St. P. R. Co.,* 46 N. W. Rep. [Wis.], 167; *Guggenheim v. Lake Shore & M. S. R. Co.,* 33 N. W. Rep. [Mich.], 161; *Breckenfelder v. Lake Shore & M. S. R. Co.,* 44 N. W. Rep. [Mich.], 957; *Hendrickson v. Great N. R. Co.,* 51 N. W. Rep. [Minn.], 1044; *Pennsylvania R. Co. v. Ogier,* 35 Pa. St., 71; *Cahill v. Cincinnati, N. O. & T. R. Co.,* 18 S. W. Rep. [Ky.], 3; *Ramsey v. Louisville, C. & L. R. Co.,* 20 S. W. Rep. [Ky.], 162; *Bates v. New York & N. E. R. Co.,* 22 Atl. Rep. [Conn.], 538.

RAGAN, C.

About 11 o'clock in the forenoon of the 20th of May, 1892, William Patten and James B. Talbot were riding in an uncovered spring wagon, drawn by two ponies, on a public highway in Boone county which crossed at grade the track of the Omaha & Republican Valley Railway Company, hereinafter called the "Valley Company." Patten handled the lines, or did the driving.   At the time the wagon was passing over the railway tracks it was struck by a locomotive engine of the Valley Company pulling a passenger train bound northwest, and Talbot was injured.   He brought this suit in the district court of Boone county against the Valley Company to recover damages for the injuries received as aforesaid.   He had a verdict and judgment, to reverse which the Valley Company prosecutes to this court a petition in error.

1. We can better understand the locality where the accident occurred, and the facts and circumstances surrounding the same, by consulting the following diagram, roughly prepared from data in the evidence:

The figure, A, B, C, D, represents section 26, in township 20 north, and range 6, in Boone county. E, F is a line drawn north and south through the center of said section. G, H is a public highway running east and west through the center of said section. R represents the center of said section. The line M, V represents the track of the Fremont, Elkhorn & Missouri Valley Railroad Company, hereinafter called the "Elkhorn Company," as located across said section. The line O, V represents the track of the Valley Company, the plaintiff in error, as located across said section. K and L are the points where the highway, G, H, crosses the two railroad tracks aforesaid. The crossing K is about one thousand feet west of R, the center of the section. The crossings K and L are about one hundred and twenty-five feet apart. The crossing at K is about five feet higher than

the crossing at L.   A row of trees extends north and south from R towards E.   A part of the southeast quarter of said section lying immediately east of the line R, E is covered by a grove.   The day the accident occurred Patten and Talbot had been out in the country doing some work in putting up or repairing windmills, and were returning in a wagon, in which they had their tools. They drove west along the highway, H, G, and the accident sued for occurred at the crossing L.   Both men were sane, both had good hearing and good eyesight, and both of them were familiar with the road on which they were traveling, and with the railroad crossings above referred to.   On the trial Talbot testified as follows:

Q. Tell the jury what use you made of your senses, if any, in approaching these two railroad tracks.

A. That is a question that it is impossible for me to answer.   I suppose I used my senses as usual.

Q. Just state the facts—what you did.

A. I cannot state what I did, because I was—

Q. I want him to state why he cannot tell.

A. I remember everything distinctly until I came down near to the mill.   I recollect everything that occurred that day; but from there my mind is blank.   I cannot recollect it.   It is a mystery to me.   I have asked the physician why it is.

Q. Do you remember of seeing the train?

A. I do not.   I have no remembrance of seeing the train at all.

Q. Do you remember the engine or anything?

A. No, sir.

Q. Was there anything to prevent you seeing an engine?

A. I would not say that there was or that there was not.

Patten testified as follows:

Q. Now, before crossing the Elkhorn track, you may state what, if anything, you did to ascertain whether there was any train approaching.

A. Well, before I got to the Elkhorn track I looked both ways for the train, but I saw none, and when I got up a little closer,—got up to the Elkhorn track,—to cross the track, I looked for the train coming from the other direction, from Albion,—that is, from the northwest.

Q. Now you may state whether you saw that train on the defendant's railroad that came up that day to Albion. Did you see it,—that is, the train going northwest?

A. I saw it when it hit me—hit us.

Q. About how far from the defendant's railroad track were you when you first got sight of the train, as near as you can tell? How far the horses' heads were from the train, as near as you can tell?

A. Well, they were not very far.

Q. How far south of the crossing were they when they first whistled?

A. I cannot say.

Q. Tell us about how far.

A. I should judge they were about 100 feet; something like that.

Q. After passing that row of trees [R, E] and looking towards the south, I will ask you if you cannot see clear down to where the Valley railroad track comes out of the grove—all the way, so as to see an engine and train coming from that direction?

A. Well, I expect you can.

Q. Well, don't you know that you can?

A. Yes, I guess we can see through there.

Q. Your best recollection is that you were in the neighborhood of that row of trees when you commenced looking?

A. I might have been by it and I might have been west of it. I did not take particular notice of that row of trees.

Q. You looked up and down the road both ways?

A. Yes, sir.

Q. Saw nothing; then you drove right on towards the railroad track, did you?

A. Yes, sir.

Q. When you were going on westward you came to the elevation going up on the Elkhorn track on your way, did you not?

A. Yes, sir.

Q. From that point looking east [southeast] I will ask you if you cannot see clear through the grove along the line of the Valley railroad track?

A. Yes, sir; you can from the Elkhorn track.

Q. As you went on that day, as you drove onto that grade of the Elkhorn track, I will ask you if you had looked to the east [southeast] if you could not have seen that train if it was anywhere within a mile of you?

A. Why, I did not look to the east [southeast].

Q. You know that country pretty well? Answer the question.

A. Oh, I might have seen it if I had looked from the Elkhorn track, but I was looking for a train coming from the other way.

Q. You did not look to the east at all, did you?

A. Not when I was on the Elkhorn track; I did not. I was looking the other way and was minding my horses, because I thought I was perfectly safe.

Q. You did not look to the east at all, did you, after you got onto the Elkhorn track?

A. No, sir.

Q. You had not looked to the east for a considerable distance before you drove up onto the Elkhorn track, had you?

A. Well, I do not know how far.

Q. Well, was it a quarter of a mile away that you had looked to the east?

A. No, sir; I do not think it was.

Q. Was it an eighth of a mile?

A. Well, it may have been, probably.

Q. Well, what is your best recollection?

A. About that, I should judge.

Q. Now then, you think it was about an eighth of a mile from the track where you looked to the east, do you?

A. Yes, sir.

Q. And not afterwards?

A. Not after that?

Q. Yes, not after that.

A. No, sir, I do not think I did, because I was looking the other way.

Q. When you were on the Elkhorn track, if you had looked east [southeast] from that point you could see the train coming from the east very easily, couldn't you?

A. Yes, sir.

Q. If you had looked from that point and saw the train coming you could have stopped the team all right, couldn't you?

A. Yes, sir.

Q. Your team was under perfect control at the time you came to the Elkhorn track?

A. Yes, sir.

Q. And after you had gone half way between the Elkhorn track and the Valley Company's track they were still under control?

A. Yes, sir.

Q. They were still under control when you were half way between the two tracks?

A. Yes, sir.

Q. And you looked towards the west to see if there was a train coming from that direction?

A. Yes, sir.

Q. And at that time, if there' had been a train coming from the west [northwest] you could have stopped them safely?

A. Yes, sir.

Q. And if you had seen one coming from the east [southeast], you could have stopped them, couldn't you?

A. Yes, sir.

Q. Then at any time until you came upon the Valley track you could have stopped those horses in time to have avoided the injury, couldn't you?

A. Yes, sir, if I had seen the train.

It thus appears from the uncontradicted evidence that Patten and Talbot drove on the railroad crossing where this accident occurred without looking or listening for the approach of a train. We have not lost sight of the fact that Patten was doing the driving; but this was a private conveyance being used by Patten and Talbot for the transportation of their tools, and under the circumstances of the case it must be held that Patten was Talbot's agent; and since there is nothing in the evidence which shows that Talbot was sick, insane, or under any disability whatever,—and we cannot indulge any such a presumption,—it follows that if Patten's act of driving on the crossing without first looking or listening for the approach of a train was negligence, and contributed to the injury for which Talbot sues, the latter cannot recover. (*Prideaux v. City of Mineral Point*, 43 Wis., 513.)

It is the duty of a traveler upon a public highway, when approaching a railroad crossing, to exercise ordinary care. All men must take notice of the fact that a railway crossing is a place of danger. And we are of opinion that a person who goes upon a railway crossing without first listening and looking for the approach of a train, in the absence of a reasonable excuse therefor, does not exercise ordinary care. We further think that the act of a party in going upon a railroad crossing without first listening and looking for the approach of a train, in the absence of a reasonable excuse therefor, admits of no other inference than that of negligence, and if such failure to look and listen contributes to the party's injury he cannot recover. *Pennsylvania Co. v. Rathgeb*, 32 O. St., 66, is a case very much like the one at bar. In that case Rathgeb was injured while attempting to cross the railroad track in a wagon. Before going upon the track he looked in one direction only. The district court charged the jury: "I will not say to you that the plaintiff should have looked east along the track. I will only say that he was obliged to use his sense of sight in a reasonable manner, and it is for you to say whether he ought to have

looked to the east along the track or not before he attempted to cross." But the supreme court held that the district court should have charged the jury that it was Rathgeb's duty to look to the east as well as the west along the track before attempting to cross it. In that case the court also held: "Ordinary prudence requires that a person in the full enjoyment of the faculties of hearing and seeing, before attempting to pass over a known railroad crossing, should use them for the purpose of discovering and avoiding danger from an approaching train; and the omission to do so, without a reasonable excuse therefor, is negligence and will defeat an action by such person for an injury to which such negligence contributed." In the case at bar, Talbot did not look towards the southeast, the direction from which the train came which injured him. He alleges as a reason for not looking in that direction that he supposed the train bound northwest had already gone by, as it should have done if it was on time; but this supposition of Talbot will not excuse him for not exercising ordinary care in looking both ways for the approach of a train. A traveler approaching a railway crossing has no right to assume that cars are not approaching on the track, or that there is no danger therefrom. If a traveler approaching a railway crossing should see a train passing, this would not authorize him to presume that another train was not following close by. (*Calligan v. New York C. & H. R. R. Co.*, 59 N. Y., 651; *Nixon v. Chicago, R. I. & P. R. Co.*, 51 N. W. Rep. [Ia.], 157; *Elliott v. Chicago, M. & St. P. R. Co.*, 150 U. S., 245; *Schmalze v. Chicago, M. & St. P. R. Co.*, 83 Wis., 663.) The conduct of Talbot,—what he did and what he omitted to do,—at the time he sustained the injury sued for is shown by his own evidence and that of his agent, Patten; and we think that reasonable and unbiased men can draw but one conclusion from this conduct, and that is that he failed to exercise ordinary care when approaching this crossing; and that his conduct was the proximate cause of the injury of which he complains.

2. The negligence charged by Talbot to the Valley Company was that the train which injured him was behind schedule time; that it was running with great speed, and that no signal was given of its approach to the crossing.    It is not possible that a train should always be on schedule time, and we do not think that the running of a train behind its schedule time is evidence which tends to prove negligence;  and outside the limits of cities, villages, and towns no rate of speed of a railroad train, however great, is evidence of negligence.  (*Chicago, B. & Q. R. Co. v. Grablin,* 38 Neb., 90; *Missouri P. R. Co. v. Hansen,* 48 Neb., 232.)  Railroad companies are organized and railroads are built and operated for speed.    Commerce, business, and the busy world are in haste.    The civilization and genius of the age demand haste, demand speed, and to require railroad companies to move their trains at so slow a rate of speed that they could be easily stopped when approaching ordinary highway crossings in the country would be to seriously impair their usefulness as carriers and take a step backwards towards the sailboat and the stage coach.

It was also charged as negligence that no whistle was sounded and no bell was rung by the Valley Company's servants as its engine and train approached the crossing where Talbot was injured.    It is required by section 104, chapter 16, Compiled Statutes of 1895, that every locomotive engine running in this state shall be furnished with a bell or a steam whistle; that this bell shall be rung or whistle sounded at least eighty rods from the place where the railroad shall cross a highway; and that such ringing or whistling shall be continued until the engine shall have crossed the highway; and that if any railway company shall omit to give these signals, it shall be liable for all damages which any person shall suffer by reason of such default.    But the failure of a railroad company to ring a bell or sound a whistle when approaching a crossing is simply evidence which tends to prove negligence on the part of the railroad company.    It does not neces-

sarily demand an inference of negligence. (*Chicago, B. &
Q. R. Co. v. Metcalf*, 44 Neb., 848.) In the case at bar the
evidence as to whether any signal, by bell or whistle, was
given as the engine which injured Talbot approached the
crossing was conflicting, and we are bound to take the
finding of the jury as conclusive, that no such signal by
bell or whistle was given. But the fact alone that the
railroad company neglected to give this signal by bell or
whistle will not authorize a recovery in this action by
Talbot. He, having shown that the signals were not
given and that the failure of the company to give the
signals was negligence on its part, in order to entitle him
to recover, must further show that such default and negli-
gence on the part of the railroad company were the proxi-
mate cause of the injury which he sustained. This he
has not done. As we have already seen, the proximate
cause of the injury sustained by Talbot was his going
upon this railroad crossing without first looking and
listening for the approach of an engine. The judgment
of the district court is reversed and the cause remanded.

REVERSED AND REMANDED.