CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY V. JOHN POLLARD.

FILED FEBRUARY 17, 1898. No. 7698.

1. **Railroad-Crossing:** DANGER: NOTICE. A railroad-crossing is a place of danger, and all persons to whom negligence may be imputed are bound to take notice of that fact.

2. ———: ———: NEGLIGENCE. A traveler on a street or public highway approaching a railroad-crossing thereof for the purpose of using it or going over must exercise ordinary care, or such care as would be exercised by a prudent man under all the facts and circumstances attendant upon and surrounding his approach to and crossing the track.

3. **Negligence:** QUESTION FOR JURY. If different minds may reasonably draw different conclusions or inferences from the state of facts established by the evidence in a cause, whether such facts show negligence or contributory negligence is not a question of law for the court but must be submitted to the jury. *Omaha S. R. Co. v. Loehneisen*, 40 Neb. 37, followed.

4. ———: EVIDENCE. The evidence in this case examined, and *held* not to establish conclusively and as matter of legal imputation contributory negligence on the part of the plaintiff.

5. ———: ———. Actions of the trial court in giving and in refusing to give instructions in charge to the jury, and to which exceptions were urged, examined, and *held* not erroneous or not prejudicially so.

ERROR from the district court of Saunders county. Tried below before BATES, J.   *Affirmed.*

*J. W. Deweese* and *F. E. Bishop,* for plaintiff in error.

*Sawyer, Snell & Frost, contra.*

HARRISON, C. J.

The plaintiff in this action, commenced in the district court of Saunders county, sought of the company a recovery of damages which he alleged became his due by reason of injuries to himself and the destruction of a wagon and harness, caused by the negligence and carelessness of the company's employés in the operation and running of a locomotive and passenger train of the company over and on its line of road through the village of' Greenwood, this state; that by reason of such negligence and carelessness the said locomotive and train of the company struck the wagon in which, with team of horses attached, the plaintiff was crossing the railroad of the company at the regular street crossing thereof in said village, and threw the plaintiff from the wagon and inflicted on him the permanent injuries of which he complained, and destroyed his wagon and harness.   The answer of the company placed in issue the material allegations of plaintiff's petition and alleged affirmatively that the injuries to himself and his property, if any occurred at the time and place claimed, were the results of his own negligence and carelessness.   Of the issues joined there was a trial to the court and a jury.   The verdict was returned favorable to plaintiff and judgment rendered thereon.   The cause is presented to this court by error proceeding on the part of the company.

The discussion in the argument is, as was stated by counsel, confined to two or three points, the main one of which is that there was such contributory negligence on the part of plaintiff as to defeat a recovery on his part though the company might have been negligent.   It is

insisted in this connection that the evidence in the case shows conclusively, and as a matter of legal imputation, negligence in the actions of plaintiff which must defeat his action to recover for the alleged negligence of the company.

This is one of the class of cases based on the incidents of accidents at crossings of streets or public highways and lines of railroads, in all of which as to the facts and circumstances there is a general likeness or resemblance, though in each there appears some particular and distinguishing facts or details not present in others. In this case the plaintiff testified as follows:

Q. Were you in the village of Greenwood on the 8th of April, 1893?

A. Yes, sir; in the afternoon.

Q. What did you take down, anything that day?

A. I took, I and my boy took, down a couple of loads of corn.

Q. Did he drive one team and you another?

A. Yes, sir.

Q. In going from your place to the elevators there in Greenwood did you cross any railroad track?

A. Yes, sir.

Q. On what street?

A. I think they call it First street.

Q. What did you do with the corn that you took to town that day?

A. Dumped it in Railback's elevator.

Q. Where is that elevator?

A. It is south of Second street.

Q. After you had dumped the corn what did you do?

A. Drove around and weighed my wagon and started for home.

Q. On what side of the railroad track were you after you had dumped your corn?

A. On the southeast.

Q. In going from Second street, or near there, when you had dumped your corn, how did you get to First street?

A. By going north.

Q. Is there a wagon road along there?

A. Yes, sir.

Q. How does it run with reference to the railroad track?

A. Along-side of it.

Q. Now describe to the jury just what you did, what precautions you took in the way of looking for any trains on the way from Connor's elevator where you put your corn until you were struck by the train.

A. Used all the caution that I could use. The teams had not been in town for quite a bit; my boy had a team behind; I dumped my load first and I was watching for a train on account of his team, and also for myself, and when I got close to the track I saw smoke down towards Ashland, and I thought to myself, there is a train coming from that way, I just held the horses until I could see it was not a train, and I just turned in an instant,— it seemed only a few instants from the time, from the time I quit looking towards Lincoln, I had looked a few minutes towards Ashland——

Q. Was it minutes?

A. Not minutes; I just looked, just turned my head toward Lincoln, and there seemed to me to be an engine standing right there, and I just slashed the lines and let the horses loose from my hands, just let them have their heads, and that is all I know about it.

Q. What signals did you hear in the way of a bell or whistle?

A. I did not hear anything.

Q. Those two toots that some witness spoke about, did you hear that?

A. I did not catch it. My wagon was a loose box and may have stopped the noise; before the sound got to me the engine got to me, and if it did toot I did not hear it.

Cross-examination:

Q. How fast were you going that day?

A. I don't know; the team was walking along, going

on the railroad crossing.    Well, I have timed them; they walk about four miles an hour.

Q. Probably three or four miles an hour?

A. Yes, sir.

Q. What kind of a team, did you have a quiet team?

A. Yes, sir; quiet.

Q. You were walking along on an ordinary walk?

A. Yes, sir.

Q. The team was quiet and paying no attention?

A. Yes, sir.

Q. There was no reason why you could not have stopped within twenty feet of it?

A. No, sir.

Q. You did not see the train until you were stepping on the crossing?

A. No, sir.

Q. The horses were stepping on the crossing?

A. Yes, sir; the horses were going over the last rail on the main line.

Q. Then you would be about over the first rail?

A. I think my wagon was; I don't know about myself, it was so quick I could not catch it.

Q. Where had you been looking?

A. Looking down toward Ashland and I saw a smoke down that way.

Q. Until you arrived at the crossing you had been looking toward Ashland?

A. Yes, sir; as the horses were starting over the switch I took my eye from toward Lincoln and turned toward Ashland, I saw smoke down there.

Q. Before you looked toward Lincoln?

A. Yes, sir.

Q. How long?

A. A few seconds.

Q. How many?

A. I could not hardly tell.

Q. Where did you begin to look toward Lincoln?

A. From the time I left the elevator.

Q. And you kept looking toward Lincoln from the time you left the elevator?

A. Yes, sir; until I looked the other way.

Q. You knew that this train was coming?

A. Yes, sir; I knew it was due about that time, the three o'clock flyer.

Q. You knew it did not stop?

A. Yes, sir; I knew it did not stop at Greenwood.

Q. You kept looking toward Lincoln until the horses stepped on the track?

A. Yes, sir; I saw smoke down there.

Q. How did you happen to see a smoke down there, looking toward Lincoln?

A. I turned my eye.

Q. You were not looking toward Lincoln all the time?

A. Maybe you know.

Q. You could not have seen a smoke toward Ashland if you had been looking toward Lincoln all the time?

A. If I had been looking direct there of course I could not, but I looked that way, and kind of cast my eye the other way and saw a smoke and held it there just a minute.

Q. Now, Mr. Pollard, as you drove along this street parallel to the railroad, you went along on an ordinary walk?

A. Yes, sir.

Q. You were not driving so that the wagon made much noise?

A. No, sir.

Q. Were you listening for the train?

A. Well, yes; my mind was on the train.

Q. You knew the train was due about that time?

A. About that time; I did not know just the time, I knew there was a "three o'clock flyer" about three o'clock.

Q. Did you know this was about three o'clock?

A. Yes, sir; about that.

Q. And your mind was on that train?

A. Yes, sir.

Q. You stood in the middle of the wagon?

A. Yes, sir; somewhere.

Q. How high would the line of your eye be from the ground as you drove along in that road?

A. I don't know.

Q. Eight feet?

A. Well, something like that, I expect; I never measured anything of that kind.

Redirect examination, by Mr. Snell:

Q. About what distance would you be in your wagon from the heads of your horses, how far from where you were standing in your wagon would it be to the heads of your horses did you say?

A. It would be about eighteen feet, I guess; somewheres near that, or sixteen feet; I never measured that.

Q. You speak of holding your eye toward Ashland a second or two, and you noticed something there. Why was it necessary to keep looking there? Was there any obstruction in the way?

A. The stock yard was there, and I think there was a box car there. I had looked to see if I was right or not, if a train comes up to switch in for the flyer to pass.

Q. As soon as you got where you could see clear by this box car there by the stock yards, then what did you do?

A. Then I turned my head to see if I could see down the track.

Q. Towards Lincoln?

A. Yes, sir; towards Lincoln.

Q. Now, what obstructions were there along the right of way, this wagon road, that prevented you from seeing towards Lincoln?

A. There was a little grain house there and an elevator office, two elevators and two offices and the depot.    *    *

Recross-examination:

Q. Where was this box car that you speak of?

A. I think there was one standing right by the hog shoot.

Q. Up toward Ashland?

A. Yes, sir.

Q. That is all, was it?

A. That is all that I seen.

It was stated by one of the witnesses called for the company:

Q. Did you see Pollard as he drove up to the track?

A. Yes, sir.

Q. I wish you would tell the jury what you saw.

A. I seen him make the turn in the road that parallels the railroad.

Q. As it goes to the crossing it makes the turn?

A. Just when he made the turn I seen him and watched him drive up on the crossing; he was in a lumber wagon, standing up, I believe; he drove up on the crossing, and seemed to be wrapped in his thoughts and oblivious of the surroundings.  It appeared to me——

A. He stood looking down into his wagon and went up on the crossing and the horses crossed, and it seemed to me near the front end of the wagon struck the main line; he looked and seen the train coming, and he slashed the horses with the lines that way (indicating), and immediately the engine hit the wheel of the wagon, and that is the last I seen of him.

Q. What did he appear to be looking at as he drove up towards the crossing?

A. He was looking down in his wagon, as though he was studying about something.

Q. Did you see him look down toward the depot?

A. I did when the front end of his wagon hit the main line, he turned his head and seen it, and struck the horses with the lines, that way (indicating).

Q. Is that the first time he looked toward the depot?

A. Yes, sir; the first I seen.

Q. If he had been looking toward the depot, could you notice that?

A. Yes, sir; I never took my eyes off him since I first see him.

Q. Why was that?

A. When I seen the man driving on there and the train coming, when I heard the train coming, and he appeared to me to be oblivious of everything around him, I kept my eye on him until the train intervened, until the train hit the hind wheel of the wagon.

Q. Could you tell about where the train was when you heard it?

A. No, sir; I only saw him when he was probably forty feet from the main line, I did not notice the train until I seen the man that drew my attention, when I seen the man driving across, and I heard the train coming, heard the roaring.

And by another:

Q. What did Mr. Pollard appear to be paying attention to, if anything, as he drove up toward the crossing?

A. He didn't seem to be paying attention to anything more than the team; he was standing there driving along, and he didn't seem to notice anything.

Q. If he had had his face turned toward the south, could he have seen from where you were?

A. Yes, sir; I think he could very readily.

Cross-examination:

Q. Did he have his face turned toward the south?

A. No, sir; not when I saw him first.

Q. Then how did you come to the conclusion that he was not paying attention?

A. He stood there just driving the team along, and didn't seem to be looking either way to me.

Q. What part of his body could you see?

A. The back and side.

Q. Do you know where his eyes were, which way he was looking?

A. His face was turned toward the horses and I suppose he was looking at them.

Q. You suppose he was looking toward the horses?

A. Yes, sir.

It will be noticed that these witnesses, other than the plaintiff, but testify to what it seemed or appeared to them he was doing, and in regard to them it must be said that this is all they could do, as they were back of or behind plaintiff and could not see his eyes or know where he was looking except by the position of his head. The train which struck plaintiff's wagon was generally known along this portion of the line of railroad as the "flyer," did not stop at the station but passed through a portion of the village and until it struck the wagon at the street crossing its speed being estimated by one witness at twenty-five miles an hour and by the majority of the witnesses at forty or fifty; they were all, however, little if any, better than mere guesses, though all agreed that it was running quite rapidly. Between the depot and this crossing of First street (the depot was in the direction from the crossing from which this train came) stood on the company's right of way, two elevators, two grain dealers' offices, and one granary, at such distances apart and so situated as to obstruct (to what extent the witnesses were not all quite of the same opinion) the view of the track or railroad which would otherwise have been open to a person approaching the crossing along the street as the plaintiff did prior to the accident. A view of the track in the other direction was obstructed by stock yards, and on that particular day by a freight car. When a point thirty-five or thirty-six feet distant from the track was reached by one approaching to cross, the view along the line toward and beyond the depot was unobstructed for a considerable distance, one quite reliable calculation placed it half a mile. In the contrary direction the view of the line of railroad was obstructed by the stock yards and a freight car.

There are many cases cited by counsel which announce the doctrine in relation to the duty of a person about to go over a railroad track on a street or road crossing. This court, in reviewing one of this class of cases, *Omaha & R. V. R. Co. v. Talbot*, 48 Neb. 627, stated

the rule as follows: "It is the duty of a traveler upon a public highway, when approaching a railroad crossing, to exercise ordinary care. All men must take notice of the fact that a railway crossing is a place of danger. And we are of opinion that a person who goes upon a railway crossing without first listening and looking for the approach of a train, in the absence of a reasonable excuse therefor, does not exercise ordinary care. We further think that the act of a party in going upon a railroad crossing without first listening and looking for the approach of a train, in the absence of a reasonable excuse therefor, admits of no other inference than that of negligence, and if such failure to look and listen contributes to the party's injury he cannot recover. *Pennsylvania R. Co. v. Rathgeb,* 32 O. St. 66, is a case very much like the one at bar. In that case Rathgeb was injured while attempting to cross the railroad track in a wagon. Before going upon the track he looked in one direction only. The district court charged the jury: I will not say to you that the plaintiff should have looked east along the track. I will only say that he was obliged to use his sense of sight in a reasonable manner, and it is for you to say whether he ought to have looked to the east along the track or not before he attempted to cross. But the supreme court held that the district court should have charged the jury that it was Rathgeb's duty to look to the east as well as the west along the track before attempting to cross it. In that case the court also held ordinary prudence requires that a person in the full enjoyment of the faculties of hearing and seeing, before attempting to pass over a known railroad crossing, should use them for the purpose of discovering and avoiding danger from an approaching train; and the omission to do so, without a reasonable excuse therefor, is negligence and will defeat an action by such person for an injury to which such negligence contributed. In the case at bar, Talbot did not look toward the southeast, the direction from which the train came which injured him. He alleges as a reason for not

looking in that direction that he supposed the train bound northwest had already gone by, as it should have done if it was on time; but this supposition of Talbot will not excuse him for not exercising ordinary care in looking both ways for the approach of a train. A traveler approaching a railway crossing has no right to assume that cars are not approaching on the track, or that there is no danger therefrom." And the question of contributory negligence may on certain conditions of facts become one of law for the court. (*Guthrie v. Missouri P. R. Co.*, 51 Neb. 746.) Also applicable in such cases we have the following principles and rules:

It is the duty of a traveler on a street or public highway about to cross a railroad track at a crossing to view the track in both directions for the approach of a train. (*Omaha & R. V. R. Co. v. Talbot, supra; Nixon v. Chicago, R. I. & P. R. Co.*, 84 Ia. 331, 51 N. W. Rep. 157; *Schlimgen v. Chicago, M. & St. P. R. Co.*, 90 Wis. 194, 62 N. W. Rep. 1045; *Railroad Co. v. Houston*, 95 U. S. 697; *Baker v. Kansas City, Ft. S. & M. R. Co.*, 26 S. W. Rep. [Mo.] 20.)

It is the doctrine of this court that "Though it is true, in many cases, that where the facts are undisputed the effect of them is for the judgment of the court and not for the decision of the jury, this is true in that class of cases where the existence of such facts come in question rather than where deductions and inferences are to be made from them. And whether the facts are disputed or undisputed, if different minds may honestly draw different conclusions from them, the case is properly left to the jury." (*Atchison & N. R. Co. v. Bailey,* 11 Neb. 332. See to the same effect *City of Lincoln v. Gillilan*, 18 Neb. 115; *Omaha, N. & B. H. R. Co. v. O'Donnell*, 22 Neb. 475; *Johnson v. Missouri P. R. Co.*, 18 Neb. 690; *Miller v. Strivens*, 48 Neb. 458; *Union P. R. Co. v. Cobb*, 41 Neb. 120; *American Water-Works Co. v. Dougherty*, 37 Neb. 373; *Omaha Street R. Co. v. Craig*, 39 Neb. 601, and cases cited.)

"The policy of the law has relegated the determination of such questions to the jury, under proper instructions

from the court. It is their province to note the special circumstances and surroundings of each particular case, and then say whether the conduct of the parties in that case was such as would be expected of reasonable, prudent men, under a similar state of affairs. When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them that the question of negligence is ever considered as one of law for the court." (*Grand Trunk R. Co. v. Ives,* 12 Sup. Ct. Rep. 679.)

When the view of the road is so obstructed as to render it difficult to see an approaching train, the question whether a traveler was wanting in due care is one for the jury to determine; and it is also a question for the jury under complicated circumstances, calculated to deceive and throw the traveler off his guard. (Beach, Contributory Negligence [2d ed.] sec. 195.)

It was not for the trial court, and is not for this court, to determine and say as a matter of law just what exact point in the plaintiff's approach to the railroad he should have looked in either direction on the track for a train, or just at what instant he should have looked in either direction for the same purpose. The question was, did he, under his surroundings and all the circumstances, observe the care which ordinarily would have been taken by a prudent person? It is insisted for the company that the evidence discloses that it was impossible that plaintiff looked and did not see the train approaching, notwithstanding what he states on this subject in his testimony; that this appears so clearly that no two reasonable men considering the evidence could or can differ in the conclusion drawn therefrom, and the question was one of law for the court. Counsel for plaintiff contend that there is presented herein a set of facts and circumstances which made the question of the contributory neg-

ligence one for the decision of the jury. The plaintiff states he looked along the track toward Lincoln, the direction from which the train came and from which he had reason to expect one at or about that time. His view of the track, in the direction just indicated, was partially, at least, and during some portions of his approach to the crossing wholly, obstructed by the buildings on the right of way, and until he was thirty-five or thirty-six feet from the main track to be crossed and on which the train came. His attention was attracted in the opposite direction by seeing some smoke there, which he conceived possibly to be proceeding from a train approaching from that direction. His view of the track looking toward the smoke was obstructed by stock yards and a freight car, and he states as soon as he obtained a clear view he turned again toward Lincoln and saw the train, but too late, as he thought, to avoid its striking him. It will be remembered that there were witnesses who stated that from where they saw the plaintiff as he approached the crossing, seemingly he was not looking either up or down the track or making any effort by use of either the sense of sight or hearing to ascertain whether there was a coming train by which he might be injured. This was a conflict in the evidence on this point. When the physical objects which were near, mainly the buildings on the right of way, their positions relatively to each other and to the track, the distance from it at which the view of the track was clear and unobstructed by the buildings to the plaintiff in his coming to the crossing, the time probably consumed by plaintiff in reaching and passing over so much of the crossing as he did, the speed of the train which while we do not think the evidence given definitely fixed it, it was conceded by all that it was running quite rapidly, that it was necessary plaintiff should look in both directions, which he says he did, that his attention was drawn away from the way from which the train was coming by smoke in the other direction, that his survey of the portion of the track to which he then turned his

eyes was obstructed, are all considered,—we cannot say that there arises a certainty that he did not and had not looked toward the approaching train, that it was impossible that he should have done so and not seen it and that it was conclusively shown that he was negligent. It might be said that in consideration of all the surroundings and complications, in the observation of ordinary care, he should have stopped his team when he saw the smoke toward Ashland, when it was within his knowledge that it was about the time a train, "the flyer," was due from the other direction, and assure himself of safety before starting over the track; but this would probably properly have been for the jury to consider as an element of the general question of whether the plaintiff, under all the facts and circumstances and his situation on the day he was injured, exercised ordinary care, was not urged in argument, and we need not give it further notice. From a full and careful examination and consideration of all the evidence we conclude that contributory negligence of plaintiff did not conclusively appear; that whether the plaintiff's precautions to avoid danger were such as prudence demanded, whether he exercised ordinary care or such care as the somewhat distracting circumstances, under all the attendant facts and circumstances demanded, was not a question of law, but one for the determination of the jury. (*Brown v. Edgerton*, 49 Pac. Rep. [Kan.] 159; *Loucks v. Chicago, M. & St. P. R. Co.*, 18 N. W. Rep. [Minn.] 651; *Moore v. Chicago, St. P. & K. C. R. Co.*, 71 N. W. Rep. [Ia.] 569; *Omaha, N. & B. H. R. Co. v. O'Donnell, supra; Breckenfelder v. Lake Shore & M. S. R. Co.*, 44 N. W. Rep. [Mich.] 957; *Nosler v. Chicago, B. & Q. R. Co.*, 34 N. W. Rep. [Ia.] 850; *McDuffie v. Lake Shore & M. S. R. Co.*, 57 N. W. Rep. [Mich.] 248; *Omaha S. R. Co. v. Lochneisen*, 40 Neb. 37.)

It is complained that the court erred in refusing to read to the jury an instruction numbered 1 prepared and requested for the company. This was to the effect that there was conclusive evidence of contributory negligence

on the part of the plaintiff; hence he could not recover in the action, and the verdict should be for the defendant. The conclusion that we have hereinbefore reached, that under the evidence herein the question of contributory negligence on the part of plaintiff was one to be submitted to the jury for decision settles the point here presented, and it follows therefrom that it was not error to refuse the proffered instruction.

It is urged that the court committed error in giving in charge to the jury an instruction numbered 5, asked for plaintiff, which reads as follows: "In determining whether the plaintiff was guilty of contributory negligence, you can take into consideration whether he looked and listened for the train, the distance from the track at which he could first see it, the obstructions to his view, the smoke he saw, if any, in the direction of Ashland, and if from all the evidence you find that he exercised the care and caution in attempting to cross the track in question at the time he did that a prudent and careful man would have exercised under the same circumstances, then the plaintiff was not guilty of contributory negligence." It is said in the brief: "This instruction invades the province of the jury, according to the holdings of this court. One of the issues in the case was whether the plaintiff himself was guilty of contributory negligence, and in this paragraph the court groups a number of facts together, and tells the jury, not that these might be considered by them in determining whether the plaintiff was guilty of contributory negligence, but tells them that he was not guilty of contributory negligence." We do not think the instruction is open to the objection urged against it. It but states that the jury may take certain facts into consideration, which was entirely proper in this case, then referring the jury to all the evidence as a basis for a finding on the question, states in correct terms what it was necessary should appear had been done by plaintiff to avoid the imputation of contributory negligence, did not state that the plaintiff had not been guilty

thereof, but that if the jury determined from all the evidence that his conduct and actions had been of a certain character, then it had decided that he had not been negligent. It might have been better to have defined contributory negligence generally and then further told the jury to ascertain from all the evidence including the consideration of the circumstances specifically set forth in the instruction quoted whether plaintiff had so acted as to be within the definition, but there was nothing misleading or prejudicially so, if erroneous, in the manner of statement employed.

The court instructed the jury of its own motion in the paragraph numbered 5 of its charge as follows: "The court instructs the jury that railroad companies, under their charters, have the same rights to use that portion of the public highway over which their track passes as the public have to use the same highway. Their rights and those of the public, as to the use of the highway at such point of intersection, are mutual and reciprocal; and, in the exercise of such rights both the company and those using the highway must have due regard for the safety of others, and use every reasonable effort to avoid injury to others." An instruction in the exact language of this appears in Sackett's Instructions to Juries [2d ed.] 403, sec. 29, over the following citations: *Indianapolis & St. L. R. Co. v. Stables*, 62 Ill. 313; Shearman & Redfield, Negligence sec. 463; *North Pennsylvania R. Co. v. Heileman*, 49 Pa. St. 60; *Cleveland, C. & C. R. Co. v. Terry*, 8 O. St. 570. This is but a general statement and might, if given alone on the subject, without other instructions modifying its import, be open to the objection that it is too general, not explicit enough, does not sufficiently explain the reciprocal rights of the parties as to the use of the highway at the crossing. It states in a certain sense the rule, and, with probably some limitations in regard to the manner and under what rules as to care and caution the use mentioned shall be exercised, may be proper in any case of the kind, but this need not be definitely

determined here, as, at the request of the company, there were given some instructions, at least three, in regard to the duty of plaintiff when about to use this crossing, which, when read in connection with this one, we think fully cleared away any misunderstanding that could possibly have arisen in the mind of any juror through the giving of this instruction, and fully destroyed any misleading force it had, if any; hence its giving, if erroneous, was not prejudicial.

It is asserted that the several paragraphs of the instructions given were conflicting and confusing. The statement in argument on this point is that the court, in an instruction asked for plaintiff and given, informed the jury it should consider certain enumerated matters in arriving at a finding as to whether there had been any negligence on the part of the company, and in two paragraphs given at the request of the company told that body, if it should determine these matters did not affect the accident as elemental of its cause, they were robbed of any significance; and also that they might have occurred or existed and been of force as to the injury was of no consequence if the plaintiff was derelict in his duty to the extent of contributory negligence. The actions of the court as to these matters were without error; hence this objection fails. No prejudicial errors have been presented and the judgment of the district court must be

AFFIRMED.