WILLIAM L. CRABTREE, ADMINISTRATOR, APPELLEE, V. MISSOURI PACIFIC RAILWAY COMPANY, APPELLANT.

FILED FEBRUARY 10, 1910.   No. 15,878.

1. Negligence: QUESTION FOR JURY. Where different minds may reasonably draw different inferences as to whether certain facts establish negligence or contributory negligence, the question of negligence must be left to the jury.

2. Death: ACTION: DAMAGES: EVIDENCE. A parent may recover for pecuniary loss which it is reasonably probable he may sustain by reason of the death by wrongful act of his minor child, and in ascertaining the amount of such pecuniary loss it is not erroneous to receive evidence of the circumstances of the father and of the age and condition of his family. *Chicago, R. I. & P. R. Co. v. Hambel*, 2 Neb. (Unof.) 607, and *Chicago, St. P., M. & O. R. Co. v. Lagerkrans*, 65 Neb. 566, distinguished.

3. Trial: INSTRUCTIONS. An instruction, by which the jury was sought to be directed that the evidence of certain witnesses was entitled to greater weight than that of others concerning a disputed fact, invades the province of the jury, is erroneous, and was properly refused.

4. Appeal: MOTION FOR JUDGMENT: REVIEW. Where only a portion of the facts involved in the determination of issues of negligence and contributory negligence was specially found by a jury, and a judgment is moved for upon such special findings upon the ground that they are inconsistent with the general verdict, the court is entitled to consider all the other facts established by the evidence, and if, taking the special findings in connection with

the other facts proved, they are consistent with the general verdict, such verdict will not be disturbed.

5. Special findings examined, and *held* not inconsistent with the general verdict, in view of the proof made under the issues.

6. **Railroads:** Injury at Crossing: Contributory Negligence. The duty of a traveler upon a public highway approaching a railroad crossing is to exercise ordinary care. If he goes upon a railroad crossing without first looking and listening for the approach of a train, without a reasonable excuse therefor, and such failure to look and listen contributes to his injury, he cannot recover.

7. ——: ——: Ordinary Care: Question for Jury. If the view of an approaching train is obstructed by cars near the crossing, if the traveler's attention is distracted by moving trains upon other tracks, or by other sounds or sights, it is a question for the jury as to whether or not the traveler has exercised ordinary care.

8. ——: ——: ——. Where a bright, intelligent girl nine years of age was killed at a railroad crossing over a public street, the jury were entitled to consider the age of the child in determining whether or not she used ordinary care under the circumstances, and a special finding that she was old enough to know the dangers of the crossing is not inconsistent with a verdict based upon the thought that she used such care as might ordinarily be expected from such a child. What might be the exercise of ordinary care in a child of nine years of age, measured by its experience and reasoning powers, might constitute gross negligence on the part of a person of mature judgment.

9. **Remarks** of Counsel set forth in the opinion, *held* not prejudicial to defendant.

Appeal from the district court for Douglas county: George A. Day, Judge. *Affirmed.*

*B. P. Waggener, George G. Orr* and *James W. Orr,* for appellant.

*S. I. Gordon, Charles E. Smith* and *W. W. Slabaugh,* contra.

Letton, J.

This action was brought by William L. Crabtree, administrator of the estate of Bessie M. Stevens, deceased, to recover damages suffered by the next of kin by reason

of the killing of plaintiff's intestate. The accident occurred on April 11, 1905, between 4 and 5 o'clock P. M., at a point where the railroad tracks of defendant cross Ohio street in the city of Omaha. The railroad runs nearly north and south, and it is intersected at right angles by Ohio street. The railroad tracks are situated in the Missouri river bottoms a short distance east of a steep hill or bluff which forms the side of the valley. From the point where Ohio street reaches the escarpment there are three flights of steps terminating at a point about 45 feet west of the first railroad track. There are about 25 or 30 dwellings on the north side, and 35 buildings on the south side of Ohio street east of the tracks, and about 200 people live in the immediate neighborhood. There is no other street across the tracks leading to the city nearer than three or four blocks to the north or five or six blocks to the south of Ohio street, so that people working in the city and school children use the path in the street leading from the east of the tracks to the foot of the steps as a main thoroughfare, although the street is not capable of use by vehicles on account of the steepness of the bluff. Directly east, contiguous and parallel to the tracks of the defendant railroad were tracks of the Chicago, St. Paul, Minneapolis & Omaha Railway. The roundhouses of both railroads were some distance north of Ohio street, and the passenger stations of both were at a considerable distance south, so that it was necessary for engines going from the roundhouse to the station to cross this street. At this point the defendant had four tracks. The two farthest west were known as "elevator tracks," there being an elevator between them about 125 feet north of Ohio street. The next track east was the main-line track, and it was upon or close to this track that the accident happened. At the time of the accident some freight cars were standing on the second track from the west, at a distance of about ten feet north of the street. There were also cars standing on the same track south of the street, at a distance of about 12 or 15 feet.

The plaintiff's intestate, Bessie M. Stevens, was a bright, intelligent little girl of about nine years of age. Her father lived on the north side of Ohio street a short distance east of the railway tracks. On the afternoon of the accident she had been sent by her mother to a grocery store west of the stairs for some groceries, and was returning carrying them in a basket. When she reached the foot of the stairs she met another little girl. She stopped and talked with her a few moments, then started eastward across the tracks. The girl who met her, Eleanor Anderson, who was then about 11 years of age, testifies that a few moments after Bessie had started east she looked around, and just as she looked saw her struck and knocked down by an engine which was running backward on the roundhouse track, at the rate of 12 or 14 miles an hour, and with no bell or whistle sounding. She testifies that from where Bessie and she were standing it was impossible to see the engine on account of the box cars on the elevated track, and that at the time Bessie was struck a train with passenger coaches on the Chicago, St. Paul, Minneapolis & Omaha Railway (hereafter referred to as the Omaha road) was running across Ohio street, and was just south of the street, and that, when struck, Bessie was looking in the direction of that train. This account of the accident is corroborated by a number of other witnesses, whose evidence it would serve no useful purpose to detail at length. It is also shown that a person standing in the middle of the main-line track looking to the north could have an unobstructed view for nearly half a mile, and would have been able to see at such a distance moving engines or cars upon either the main-line or roundhouse tracks. The little girl was struck on the left side of her head by the beam on the rear end of the tank of the engine, which, as the engine was running backward, was in front. It is 45 feet from the foot of the steps to the first track, 15 feet from that to the second, 9 feet from the second to the third, and 11 feet from the third to the fourth.

On the part of the defendant it is shown that the engine was a large freight engine with a high tank, which was being operated from the roundhouse to the passenger station by two employees, the hostler and hostler's helper. The hostler testifies that he was in charge of the engine; that his position was upon the east side; that he could see the rail upon his side of the track immediately behind the tank, and could see the other rail a car length away at an angle; that the tank was high and square, and he could not see over it; that the first thing that attracted his attention as they went south was that his helper called to him; that from his gestures and call he supposed something was the matter, and at once threw the throttle back and whistled twice. The engine stopped at a distance of 90 feet south of Ohio street. The witness says he was going about 6 or 7 miles an hour, and that he could not have stopped the engine any quicker. The helper testifies that after the engine was about half way down from the next street north he saw the little girl come out from behind the elevator on Ohio street; that she was standing in the middle of the main-line track; that when she stopped on the main-line track they were about four engine-lengths away, and that when they got about an engine-length away, and when he was ringing the bell, he saw her move, and called to the hostler, who shut off the engine and applied the air brake; that the little girl was looking southwest when she started toward the engine, and that she approached the track with her back partly toward it. He also says that the engine was moving about 6 or 7 miles an hour. He testifies that the engine whistled about 4 or 5 feet from her, and just before she was struck; that he yelled at her just after the whistle was blown. He also says that he remembers a train being on the Omaha track southeast of there. Another witness for defendant was a switchman in the employ of the Omaha road, who testifies that at the time of the accident he was standing southeast of the crossing, throwing the switches on that road to allow a train to back down from

the roundhouse to the station. He testifies that he saw the little girl come down from the steps and walk toward the tracks; that he saw the engine coming, and that he called to her and beckoned with his hand to call her attention; that she was looking southeast at the time she stepped upon the track, and that his calling out and the gestures which he made induced the Omaha train to stop as it approached. He says that the Missouri Pacific engine was running at from 6 to 8 miles an hour, and that the bell was ringing. As to this point, his cross-examination seems to weaken his testimony. He could not say whether he heard any whistle.

The jury returned a general verdict for the plaintiff in the sum of $1,900. They also returned six special findings, which the defendant claims are inconsistent with the general verdict, and which we will consider later.

1. The first point discussed in defendant's brief is that the court erred in overruling a motion to direct the jury to return a verdict for the defendant for the reason that the plaintiff had failed to make out or prove any cause of action. It is argued that, by the undisputed evidence, the deceased was guilty of contributory negligence to such extent as to bar a recovery; that she was a bright girl who knew the dangers incident to crossing the railroad tracks and was familiar with the locality; that it was her duty to look and listen, and that she carelessly walked immediately in the way of a backing engine after it was too late to stop it. It is also said that the defendant was not guilty of any negligence; that according to defendant's witnesses the bell was kept constantly ringing, and that the fireman, seeing her standing in a place of safety, had a right to presume she would avoid the danger. This motion was made at the close of plaintiff's evidence, and renewed at the close of all the evidence. When first made, the motion was properly overruled. The evidence of plaintiff's witnesses, if believed, clearly disclosed negligence on the part of the defendant in backing an engine at a rate of from 12 to 14 miles an hour over a street

crossing in constant use by foot-passengers, without giving warning by bell, whistle, or otherwise, and at a point where the view of the track on which it was running was obstructed by freight cars standing near the crossing. The testimony at that time was sufficient also to carry the case to the jury for determination as to whether the deceased was guilty of contributory negligence. It was shown that it was only a few steps from where the view was obstructed to the place where she was struck, and that immediately in front of her a train was moving upon the tracks of the Omaha road, which apparently drowned the noise of the backing engine and distracted her attention. Under these circumstances, we think the question of whether or not the plaintiff was guilty of contributory negligence was one upon which reasonable men might well differ, and must therefore be for the jury to determine. The matter was in nowise altered after the defendant's witnesses had testified. The truthfulness of their accounts as to the rate of speed, the giving of signals, and the actions of the little girl was, as compared with that of plaintiff's witnesses, a matter for the jury to determine, and not for the trial court, and we think the court properly overruled the motion.

2. It is next argued that the court erred in permitting the plaintiff to prove, over the objections of the defendant, the financial condition of plaintiff's father, and the fact that he had a family consisting of a wife and children, citing the cases of *Chicago, R. I. & P. R. Co. v. Hambel*, 2 Neb. (Unof.) 607, *Chicago, St. P., M. & O. R. Co. v. Lagerkrans*, 65 Neb. 566, and *Chicago, R. I. & P. R. Co. v. Holmes*, 68 Neb. 826. The doctrine of these cases, we think, is inapplicable here. In the *Hambel* case the railway company sought to show that the value of the estate of the deceased was $50,000. The offer was rejected by the trial court for the reason that it afforded no information as to the pecuniary loss which would result from the death. The *Lagerkrans* case was an action in behalf of a widow who had married again. The *Holmes* case was an

action in behalf of the widow. In each of these cases the next of kin had a direct legal interest in the earnings of the deceased. He was under a legal obligation to support them, which at the time of his death he was discharging. It is clear that in such cases the value of the estate left by him would be of no aid in determining what the pecuniary loss, occasioned by his death would be, since it affords no criterion as to his earning capacity and the amount he was contributing to their support. This, however, is a different case. The pecuniary loss which the father might reasonably be expected to suffer after the time when the deceased would have attained her majority by reason of her death would be in the nature of things liable to be affected in a large degree by the circumstances of himself and family. The ordinary experience of mankind, as to social and family relations is such as to convince us that a child, who after majority is under no strict legal obligation to contribute pecuniary aid to her parents, would be much less liable to do so if the family were small or were able to support themselves, or the financial circumstances of the parent were such as to render such assistance unnecessary, than if they were indigent and poverty stricken. It stands to reason that a poor man with a large family of small children to support would ordinarily be more apt to suffer pecuniary loss by the death of a child, who was able to contribute to the support of the family, than one who required no such assistance. We are not unaware that some cases have held that the probability of such aid being afforded after the child attains majority is so remote and speculative as not to furnish any reasonable basis for estimation by a jury. *Cooper v. Lake Shore & M. S. R. Co.,* 66 Mich. 261. But such is not the rule in this state.

In *Johnson v. Missouri P. R. Co.,* 18 Neb. 690, this court said in an opinion by Reese, J.: "But, it is said that the word 'pecuniary' as used in our statute is not construed in a strict sense. The damages are largely prospective, and their determination committed to the discretion of

juries upon very meagre and uncertain data. A parent may recover for loss of expected services of children not only during minority, but afterwards, on evidence justifying a reasonable expectation of pecuniary benefit therefrom. Neither is it essential that this expectation of pecuniary benefit should be based on a legal or moral obligation on the part of the deceased to confer it, but it may be proved by any circumstances which render it probable that such benefit would, in fact, be realized. And as a right of action is given whenever the injured person, had he lived, could have maintained an action, at least nominal damages may be recovered. 3 Sutherland, Damages (1st ed.), pp. 182, 183; *City of Chicago v. Scholten*, 75 Ill. 468; *Johnston v. Cleveland & T. R. Co.*, 7 Ohio St. 336; *Pennsylvania R. Co. v. Keller*, 67 Pa. St. 300; *McIntyre v. New York C. R. Co.*, 37 N. Y. 287; *North P. R. Co. v. Kirk*, 90 Pa. St. 15; *Chicago & A. R. Co. v. Shannon*, 43 Ill. 338; *Illinois C. R. Co. v. Barron*, 5 Wall. (U. S.) 90; *Grotenkemper v. Harris*, 25 Ohio St. 510." This has been the rule in this state ever since. *Missouri P. R. Co. v. Baier*, 37 Neb. 235; *Tucker v. Draper*, 62 Neb. 66; *Draper v. Tucker*, 69 Neb. 434; *Post v. Olmstead*, 47 Neb. 893. In the latter case the evidence shows that the father was a poor man with four children younger than the deceased, and it is said: "The pecuniary damage to a next of kin is always more or less a matter of estimate, if not of conjecture." This holding is not inconsistent with that in *South Omaha Water-Works Co. v. Vocasek*, 62 Neb. 710, that "the establishment of the poverty of plaintiff, or the dependence upon him of the mother and other children, as a direct ground for the jury's action upon the matter of damages, is wholly inadmissible." In that case it was held proper to establish the existence of the mother and other children, "not as a direct ground for the jury's action, but as showing what deceased was doing and liable to do to make his life pecuniarily valuable to the plaintiff. The evidence is admissible, not as establishing directly a greater right to consideration from the

jury, but as showing what consideration plaintiff was actually receiving, and likely to receive in the future, from this son." See, also, *Bright v. Barnett & Record Co.,* 88 Wis. 299, 26 L. R. A. 524, and cases cited. We think the distinction is clear between cases of this class and of the class of the *Hambel* case, and that no error was made in the reception of this testimony.

3. It is next contended that the court erred in refusing to give to the jury instruction No. 8, requested by the defendant. This instruction informed the jury that the testimony of a witness who testified that he did not hear the engine whistle or the bell ring is not entitled to the same weight as one who testified positively that the bell was ringing or the whistle sounded, and that such negative testimony is entitled to but little weight. This court has repeatedly held that instructions which direct the jury as to the weight to be given to testimony of one witness or set of witnesses as distinct from another infringe upon the province of the jury and are erroneous. *Wilson v. Gamble,* 50 Neb. 426. The writer is not much in sympathy with this view of the law, but it is too firmly established in this state to warrant a change by mere judicial act.

4. The next complaint is in regard to the giving of instruction 13. This complaint we think is more technical than sound. The petition alleged that it was the duty of the persons running engines over the track, when approaching the crossing, to keep a lookout for persons at the crossing, and to sound the whistle or ring the bell at a sufficient distance to warn any person approaching, and also that it was the duty of the company to keep and maintain a watchman at the crossing to warn persons of the approach of switch engines. It is also alleged that the engine, "without warning of any kind", ran over the crossing and caused the death of the child. The jury were instructed that if they found those in control of the engine "did not exercise a lookout ordinarily consistent with their duties in the practical operation of the train, or

that the defendant was negligent in failing to provide a watchman at the crossing, or was negligent in the rate of speed of said engine, and that such failure or either of such failures was the proximate cause of the injury of the deceased, * * * then you should find for plaintiff." The fault found is that there is no charge of negligence in the petition based upon the defendant's failure to maintain a watchman or of its employees to keep a vigilant lookout. While perhaps not entirely specific and definite, we think that the language of the petition that the defendant failed to give "warning of any kind" at the crossing, taken in connection with the allegation of the necessity for a watchman, negatives the idea that a watchman had been stationed there, and the further allegation, that if defendant's employees had kept a lookout they could have prevented the accident, negatives the thought of a vigilant lookout being kept. No motion was made to make the language more specific, and in any event we cannot see how any prejudice could have occurred to the defendant from the giving of this instruction.

5. It is contended that the district court erred in not sustaining defendant's motion for judgment on the special findings of the jury *non obstante veredicto*. It is insisted that the general verdict is inconsistent with the special findings, and that, since the special findings control, the court should have rendered judgment in its favor on the facts found. The jury found, in substance, that Bessie M. Stevens at the time of the accident was of sufficient age, intelligence and experience to know and realize the danger usually attendant upon crossing railroad tracks; that when she stepped upon the main-line track and before attempting to cross the track next east, if she had looked to the north, there was nothing which would prevent her seeing and knowing of the approach of the engine in time to have averted the accident; that she knew that engines and cars frequently moved along the tracks in both directions across Ohio street; that she did not look to the north before attempting to cross over the roundhouse track; and

that, if she had done so, she could have seen the engine. These special findings may all be taken as true and yet be consistent with the general verdict. The evidence which the jury accepted shows that her view of the tracks was obstructed until the main-line track was reached; that the engine was backing swiftly and silently, and that immediately before the child was struck a moving train was passing over the crossing in front of her; that a switchman a short distance to the southeast was shouting to her and endeavoring to attract her attention, and that she was looking in that direction. Under these circumstances, and with these facts added to the facts found by the special verdict, there is no inconsistency. *Kafka v. Union Stock Yards Co.,* 78 Neb. 140. The rule in this state is not that there is an absolute obligation upon a person crossing a railway track to stop, look and listen before attempting to cross, but, as laid down in *Omaha & R. V. R. Co. v. Talbot,* 48 Neb. 627, the duty of the traveler upon a public highway approaching a railroad crossing is to exercise ordinary care. If he goes "upon a railroad crossing without first listening and looking for the approach of a train, *without a reasonable excuse therefor,* * * * and if such failure to look and listen contributes to the party's injury, he cannot recover." The qualifying words, *"without a reasonable excuse therefor",* are of great significance in this connection. If, as in this case, the view of approaching trains is obstructed by freight cars standing near the crossing, if the traveler's attention is distracted by moving trains upon other tracks, or by other sounds or sights, if no warning signals are given or lookouts stationed, it is a question for the jury as to whether or not the traveler exercised ordinary care. *Chicago, B. & Q. R. Co. v. Pollard,* 53 Neb. 730; *Union P. R. Co. v. Connolly,* 77 Neb. 254; *Schwanenfeldt v. Chicago, B. & Q. R. Co.,* 80 Neb. 790; *Nilson v. Chicago, B. & Q. R. Co.,* 84 Neb. 595; *Grand Trunk R. Co. v. Ives,* 144 U. S. 408; *Cherry v. Louisiana & A. R. Co.,* 121 La. 471, 46 So.

596, 17 L. R. A. (n. s.) 505, and note. It may further be said that, while the jury found specially that deceased was of sufficient age, intelligence and experience to know and realize the danger usually attendant upon crossing railroad tracks, this does not amount to a finding that she was possessed of sufficient judgment and discretion so that she would be held to the same accountability as a person of mature years. What might be the exercise of ordinary care in a child nine years old, measured by its experience and reasoning powers, might constitute gross negligence on the part of a person of mature judgment. The jury were entitled to consider the age of the child in determining whether or not she used ordinary care under the circumstances, and the finding that she was old enough to know the dangers of the crossing is not inconsistent with a verdict based upon the thought that she used such care as might ordinarily be expected from an infant of such tender years.

It is next contended that the verdict is excessive. The jury found specially that the father might reasonably have expected to receive from the deceased after she arrived at her majority, had she lived, the sum of $1,900. As has been said, it is exceedingly difficult to estimate with any degree of precision the amount of damages which would accrue to the next of kin by the killing of a minor child. The matter, by the very nature of things, must be left largely to the discretion and good judgment of the jury, taking into consideration all the surrounding circumstances tending to throw any light upon the amount which the father might reasonably be expected to receive from the deceased. If the sum awarded as damages is not clearly excessive and unreasonable, a reviewing court will not interfere with the verdict. We are of the opinion that the amount of recovery in this case would not justify the court in setting aside the verdict for that reason alone, or even in requiring a remittitur.

6. Misconduct on the part of the counsel for the plaintiff is complained of, in this, that at the close of the argu-

ment he said: "All we ask of you is that you be careful and not allow the special findings to conflict with your general findings." We cannot see that the defendant was harmed by this remark. While, as defendant contends, the full duty of the jury with respect to the special findings was to answer the questions as they believed the facts to be, and we think it would have been better if counsel had refrained from making this remark, yet, at the same time, we cannot see how the defendant could be prejudiced by it. The special findings were all answered in accordance with its views; it seeks to base a judgment upon them, and, even if we accept the defendant's theory that they are inconsistent with the general verdict, the jury not only paid no attention to the remark, but acted in direct opposition to the request.

Upon the whole record, we find no prejudicial error, and the judgment of the district court must be

AFFIRMED.