MARY KAFKA, ADMINISTRATRIX, APPELLEE, v. UNION STOCK YARDS COMPANY, APPELLANT.

FILED JUNE 29, 1910.   No. 16,285.

1. **New Trial:** MOTION FOR JUDGMENT: WAIVER. A motion for judgment on special findings notwithstanding the general verdict, and one for a new trial, may be filed by the defendant at the same time; and the submission and decision of the former motion will not operate as a waiver of the latter.

2. **Negligence:** QUESTIONS FOR JURY. "If different minds may reasonably draw different conclusions or inferences from the state of facts established by the evidence in a cause, whether such facts show negligence or contributory negligence is not a question of law for the court, but must be submitted to the jury." *Chicago, B. & Q. R. Co. v. Pollard,* 53 Neb. 730.

3. **Railroads:** USE OF STREETS: LIABILITY. "A railroad company operating a train upon a city street, used in common by it and by pedestrians and vehicles, may be required to take precautions against collisions which are not necessary when it is operating trains upon its own right of way." *Schwanenfeldt v. Chicago, B. & Q. R. Co.,* 80 Neb. 790.

APPEAL from the district court for Douglas county: WILLIAM A. REDICK, JUDGE. *Affirmed.*

*Montgomery & Hall* and *Frank T. Ransom,* for appellant.

*S. A. Searle* and *J. L. Kaley, contra.*

LETTON, J.

This is the second time this case has been before this court. See 78 Neb. 140. When it was here before, the sole point determined was that the district court erred in sustaining a motion for judgment for the defendant on the special findings of the jury notwithstanding the general verdict. It was held that the special findings were insufficient to sustain the judgment, and the judgment of the district court was reversed and the cause remanded for further proceedings. Prior to the order sustaining the motion for judgment upon the special findings, a motion for a new trial had been filed by the defendant. This motion was not ruled upon until after the cause had been remanded to the district court, when it was overruled. The court then rendered judgment in favor of the plaintiff upon the general verdict, and from this judgment the defendant now appeals.

Plaintiff insists that the two motions filed by the defendant, one for judgment on the special findings, the other for a new trial, are inconsistent, and that by asking the court to sustain the motion for judgment it in effect requested it to overrule the motion for a new trial. This is the view taken by the supreme court of Iowa. *Nixon v. Downey & Wolverton,* 49 Ia. 166; *Pieart v. Chicago, R. I. & P. R. Co.,* 82 Ia. 148; *Schulte v. Chicago, M. & St. P. R. Co.,* 124 Ia. 191. See, also, *Kernan v. St. Paul City R. Co.,* 64 Minn. 312. In *Luse v. Union P. R. Co.,* 57 Kan. 361, a general verdict was returned in favor of the

plaintiff, together with a number of special findings. The defendant filed a motion for judgment on the special findings, and also a motion for a new trial. The court sustained the motion for judgment, and the journal entry recited: "The court is of opinion that the general verdict in this cause is not sustained by sufficient evidence, and is contrary to the evidence; but inasmuch as the motion for judgment on the special findings has been sustained, and for that reason only, said motion for a new trial is overruled." Judgment was thereon rendered on the special findings for defendant, but the point at issue here is not squarely decided. Plaintiff insists on the strength of these decisions that this cause was finally disposed of by the trial court when it rendered judgment for the defendant, and that the motion for a new trial was overruled by implication. On the other hand, the defendant argues that it has a constitutional right to be heard in the court of last resort by appeal, under section 24, art. I of the constitution; that it was not injured until the former judgment was set aside and a judgment rendered upon the general verdict, and not until its motion for a new trial was overruled had it any basis for an appeal. Its position is supported by the cases of *Fisk v. Henarie*, 15 Or. 89; *Brannon v. May*, 42 Ind. 93; *Chicago & N. W. R. Co. v. Dimick*, 96 Ill. 42; *Atchison, T. & S F. R. Co. v. Holland*, 58 Kan. 317; and *Davis v. Turner*, 69 Ohio St. 101. We are convinced that with the constitutional protection to the right of appeal afforded by the article referred to, the views of the latter courts are to be preferred to those of the supreme court of Iowa, and the motion to dismiss the appeal, therefore, is overruled.

Proceeding now to consider the appeal, the former opinion recites at length a number of allegations in the petition and answer, together with the special findings, so that it becomes unnecessary at this time to repeat the statement of the issues involved. The discussion, however, in that opinion was based upon the special findings and pleadings alone, and not upon the evidence in the case,

so that it now becomes necessary to consider further facts shown by the proof material to the controversy.

The deceased had been carrying the noonday lunch to his sons who were working in the packing plant of Swift & Company in South Omaha. About noon on the day he was killed, he was returning eastward on the sidewalk on the south side of Q street in that city. Two switch tracks of the defendant cross this street running nearly north and south and almost at right angles to the street. Close to the railroad tracks, and fronting north on Q street, is situated the two-story office building of Swift & Company. At this time an engine belonging to defendant and moving parallel to the line of the wall of the office building approached the crossing. At the point where the railroad tracks crossed the sidewalk there is a high, tight board fence with high gates of like nature across the tracks which inclose the tracks. The fence is parallel to the tracks. The gates are nearly in line with the north line of the office building, so that when the gates are closed, or when engines or cars are south of the street line, it is impossible for them to be seen by any one walking along the street west of the buildings until close to the tracks. The jury found by their special finding that, when Kafka reached a point five feet west of the west rail of the track on which he was injured, he could have seen an engine approaching on that track for a distance of 100 feet; when he stepped upon the track the engine was about a foot away, and when he was within five feet of the west rail of the track, the engine which struck him was 21 feet away. These findings seem to be supported by the evidence, but other material facts affecting the liability of the defendant appear in the evidence and are settled by the general verdict. The gates, ordinarily, are kept closed, but when it is necessary to take cars in or out of the Swift & Company inclosure they are opened to permit the passage of the engine and cars. The street at the point where the accident occurred is covered by a viaduct for nearly its whole width.

The witnesses for the plaintiff testify in substance that the accident occurred a few minutes after noon, and that there were 100 or more people upon the street close to the crossing at the time; that there are from 900 to 1200 employees working at Swift's; that they stop for dinner at 12 o'clock, and ordinarily there are a large number of people passing between 12 o'clock and half past 12 directly in front of the office building where the tracks cross Q street; that on account of the passage of cars and wagons over the viaduct there is often a great deal of noise at that point; that there was no flagman at the crossing; that cars pass over this viaduct every five minutes; that the street in front of the office is paved with cobblestones.

Mr. Houlabeck testifies for plaintiff that on the 21st of February, 1903, he was working for Swift & Company; that when he first saw Kafka on that day he was going east 15 feet from the corner; that he left the sidewalk about 4 feet from the office building at the gatepost and walked across the street northeast toward a stairway which ascends to the top of the viaduct; that, as he walked, some one called to him and he stopped and turned around; that when they called to him he turned toward the north, and faced west when the engine struck him; that Kafka looked around before he got onto the tracks; that when he was about 2 or 3 feet from the track on the west side the engine that struck him was on the west track running at the rate of about 12 miles an hour; that the gate next to the building over the footpath was closed; that there was no watchman or flagman there; that at the time Kafka was struck there was a street car passing over the viaduct, and that there was a loud roar and rumbling noise under the viaduct at that time on account of this; that he could not say whether a bell was ringing, on account of the noise; that Kafka was about 7 feet from the building at the time he was struck, just off the walk and only about 4 feet from the opening; that he was pushed along after he fell for about 12 feet;

that the fence obscures the view, and that the railroad track at the south curves in toward the building. On cross-examination he says that it was only a few seconds after he saw him until the engine struck him; that he was about 70 or 80 feet from Kafka when he first saw him, and was walking toward him until he was struck. He also testifies that the engine was about 20 to 25 feet from Kafka just before he got to the rail. Mr. Swatek testifies that he saw Kafka when they were taking him out from under the engine, and that just before the injury there were about 100 people on the street in the neighborhood of the crossing at that time. Kafka's daughter testifies that he was continuously employed, and that he earned from $1.75 to $2 a day; that he was a strong man in good health, and was a hard working, industrious man. The testimony of a number of witnesses for the defendant is largely devoted to showing the spot were Kafka was struck, and the distance that an engine could be seen to the south from that point.

The special findings of fact as to the latter point seem to have been based upon this evidence. This renders it unnecessary to consider the same in detail. But there are other facts worthy of note in the testimony of defendant's witnesses. The fireman testifies that the engine was going about 6 miles an hour and was about even with the gate when he first saw Kafka; that he was about 6 or 7 feet from the west rail of the track and about 26 or 27 feet north of the office building; that the engine bell was ringing automatically; the whistle was blown when the engine was 3 car lengths from the crossing; that Kafka was going east with his head down, and that Kafka could have seen the engine if he had looked, but he never raised his head; that the engine started about 180 feet back of the gate. The pilot beam was about even with the gate when he first saw Kafka; that the window between him and Kafka was wide open; that he could have seen Kafka sooner, but the fence was between them, and that as soon as Kafka got beyond the fence he saw him.

The engineer testifies that the cab was about even with the gate when he got the sign from the fireman to stop, and that the engine stopped in about 6 feet; that he did not see Kafka till they took him out. He was asked whether he did not say in the presence of one Koutski that the engine was going at the rate of 12 to 15 miles an hour, but denies that he did so. He also testifies that Kafka was picked up about 25 feet north of the gate. .

Mr. Harris, a timekeeper for Swift & Company, was under the viaduct 8 or 10 feet north of the gate into the the Swift plant, which is about 40 feet west of the crossing. He was facing south and Kafka passed by him going east. The witness says he walked probably 40 feet from where he stood and was struck by the engine; that he hollowed at him when he was about 5 or 8 feet from the track; that Kafka did not look up when he hollowed; that he was 15 to 18 feet north of the office building at the time before he stepped on the track, and was about along the south edge of the viaduct. The witness knew the engine was in the inclosure, heard it coming, and saw it as it came opposite the gate. "Q. Now, then, how far had Kafka gone? In other words, how far was Kafka from the rail when you saw the nose of the engine in Q street? A. Well, I guess a step would be about all he would take; I don't know that I could state just how far he had gone." He testifies further that he shouted two or three times; that he could not state what track it was that Kafka was struck on, and that he was under the impression he was on the second track.

Mr. Stewart, a switchman, was in front of the main entrance to the Swift plant standing beside Mr. Harris. He testifies that when he saw Kafka he was near the middle of the street, walking across the track with his hands in his pockets and his head down. Kafka was from 4 to 6 feet from the west rail of the track when Harris shouted, the engine was just coming through the gate, and Kafka was about 15 feet north of the gate. This witness also says that he cannot say whether Kafka

was on the west track or the east track when he was struck; that when the engine was coming and Mr. Harris called he took about 2 or 3 steps, turned and threw up his hands just as the footboard struck him. Other witnesses for defendant testify that Kafka was about 4 or 5 feet from the track when the shouts were given; that he did not look up or pay any attention before he was struck. The impression of several of these witnesses is that he was on the east track when he was struck. This is not material, except to show how easily honest witnesses may be mistaken as to a fact when observed from a comparatively short distance and in a moment of excitement. On rebuttal Mr. Koutski testified that the engineer told him the engine was going 12 to 15 miles an hour when he received the signal to stop.

It will be seen that as to the speed of the engine, the place where Kafka was struck, and whether or not Kafka looked before he crossed the tracks, there is a conflict in the evidence.

We find in the reply brief of defendant what purports to be a copy of the opinion of Hon. W. A. Redick, judge of the district court, in overruling the motion for a new trial, a portion of which seems so apposite that we adopt the language quoted:

"The first question is as to the negligence of defendant; Two witnesses for defendant swore the engine was going 6 miles an hour, a witness for plaintiff said 12 miles, and another witness swore that one of defendant's witnesses had stated on one occasion that the rate of speed was 12 miles an hour. In this state of the record there is sufficient evidence to warrant a finding either way, and in support of the verdict we must assume the jury found the higher rate. It was for the jury to say whether or not, under all the circumstances, such rate was negligence. No other charge of negligence is sustained.

"The next question is whether or not plaintiff's negligence, if any, contributed to the accident. Defendant claims that plaintiff walked upon the track with his head

down and without looking to see whether an engine or train was near—and without listening, but it is altogether probable that he might not hear the engine and signals by reason of the noises made on the viaduct, and other engines or trains passing along. On the question of looking, at least four witnesses for defendant testified that they saw Kafka approach the track; that his head was down and they did not see him look in either direction until some one yelled and he looked up and back, and at this instant was struck by the engine.

"The plaintiff produced one witness, Houlabeck, who first testified that Kafka walked right up to the track until somebody yelled, when he looked up and was immediately struck by the engine; later on, however, he stated that 'he glanced toward the fence and then started off'— 'he looked around just as he got about 2 or 3 feet from the track.' 'Just took a look and started across the track.' The witness, Houlabeck, was discredited later on, and if this question is one of law I would have little difficulty in finding for defendant on the great preponderance and weight of the evidence in its favor; but before it becomes a question of law, all reasonable men must agree. Two of defendant's witnesses said Kafka did not turn his head until some one hollored; that he paid no attention to the holloring at first when he was 4 to 6 feet from the track, nor until he was right on the track. Some of these witnesses were back of Kafka 25 to 40 feet and appreciated his danger, although their position was not nearly as favorable for seeing or hearing the engine as was Kafka's.

"I can scarcely conceive of a stronger case of defendant sustaining the burden of proof than this; the plaintiff's whole case in this issue depending alone upon the unsatisfactory evidence of Houlabeck. But, notwithstanding the impeachment of Houlabeck, he may have told the truth in this instance. It is possible that defendant's witnesses did not observe Kafka glance toward the fence. They were behind him quite a distance. They are testifying to a negative. They say he did not turn his

head; and while they were in position to see, he might have done so and they not have observed it or remembered it; while the evidence of Houlabeck is positive and for that reason stronger. The evidence of one credible witness that he saw a certain thing happen is much stronger than that of several witnesses that they did not see it happen, when the event under investigation is the conduct of a third person, and the witnesses speak only from observation and memory."

The judge continued that he was unable to distinguish this case from *Chicago, B. & Q. R. Co. v. Yost*, 56 Neb. 439. We think the distinction is clear. Yost was a trackman working on the railroad. With full knowledge of the fact that trains and engines were frequently passing each way upon the main track, he carelessly stepped close to it in full view of a passing engine and was injured. The negligence of the railroad company in the *Yost* case was not clear, while that of Yost was apparent. He was not walking in a busy street of a populous city where the care required of the railroad company is commensurate with the danger to the public. In this case a crowd of people were passing at the busiest hour of the day, the noise of the approaching engine was apparently drowned by the rumbling of a street car on the viaduct overhead. In that case the place where the accident occurred was at a point where no one had a right to go except employees of the railroad company, and the risk of accidents arising from the ordinary operation of trains was open and obvious. In this case the accident occurred upon a switch track in a crowded street where Kafka had a right to pass, and where the defendant was bound to use special care for the safety of foot passengers.

In this case, too, the engine approached from behind obstructions, and while a person close to the track could have seen it for 100 feet, the special findings establish the fact that when Kafka was within 2 steps of the track and only 4 feet from a point where the projecting footboard of the switch engine would reach, though he might

have seen an engine at a distance 100 feet south, the engine was in fact only 21 feet away. If the engine was running 12 miles an hour, this distance was traversed in a little more than a second. The jury found that the engine went 20 feet after Kafka was within 5 feet of the track before it struck him, hence they must have been convinced that it was going about 12 miles an hour. Considering the time and the place, the crowded street, the noise of traffic overhead, the obstructing building, and the inclosed tracks, the defendant was held to a very high degree of care, and the deceased had the right to believe that this would be exercised. On his part he was held to the exercise of that care which an ordinarily prudent person should exercise when crossing switch tracks in a public street under like circumstances, and whether he so acted or not is for the jury where the evidence conflicts. The jury believed Houlabeck's story that Kafka was in the exercise of due care, and we would not be justified in setting aside their verdict, in view of the gross negligence of defendant in switching in such a place, at such a time, at the rate of 12 miles an hour, or even at the rate of 6 miles an hour, without other precautions than those taken for the safety of the crowds.

Many cases have been cited by defendant's counsel as to the duty of persons crossing a railroad to look and listen, but many of them are not applicable in a case where the tracks are switch tracks from a private inclosure crossing a public street. We adhere to the view that, "if different minds may reasonably draw different conclusions or inferences from the state of facts established by the evidence in a cause, whether such facts show negligence or contributory negligence is not a question of law for the court, but must be submitted to the jury. *Omaha Street R. Co. v. Loehneisen,* 40 Neb. 37, followed." *Chicago, B. & Q. R. Co. v. Pollard,* 53 Neb. 730. *Shirley v. City of Minden,* 84 Neb. 544; *Hair v. Chicago, B. & Q. R. Co.,* 84 Neb. 398; *Crabtree v. Missouri P. R. Co.,* 86 Neb. 33. We, also, adhere to the rule that "a railroad com-

pany operating a train upon a city street, used in common by it and by pedestrians and vehicles, may be required to take precautions against collisions which are not necessary when it is operating trains upon its own right of way." *Schwanenfeldt v. Chicago, B. & Q. R. Co.*, 80 Neb. 790.

It is contended that the damages are excessive. But it is shown that there are three minor children, and that Kafka was frugal and industrious, and devoted his earnings to the support of his family. He was 52 years of age, usually earning $1.75 a day, and apparently in good health. We think a judgment of $3,380 not excessive under these conditions.

The case seems to have been tried with painstaking care, and the instructions fairly present the issues. We find no error in the record prejudicial to the defendant, and are all of the opinion that the judgment of the district court should be

AFFIRMED.