EMMA C. TYLER, APPELLEE, v. A. L. HOOVER, APPELLANT.

FILED OCTOBER 18, 1912. No. 16,617.

1. Highways: USE BY AUTOMOBILES. The law does not denounce the use of an automobile on a public highway, and the appellant is not guilty of negligence because he used one on the streets of the city of Lincoln.

2. ———: ———. It is improper to say that the driver of a horse attached to a carriage has rights in the road superior to the rights of the driver of the automobile, as both have a right to go upon the public highway, and each is restricted in the exercise of his rights by the corresponding rights of the other, and each is entitled to regulate his use of the public streets and roads by the observance towards others on the road of ordinary prudence and care under all the circumstances.

3. ———: ———: CARE REQUIRED. The restrictions which the law imposes on all modes of travel on the highways are such as tend to secure to the general public the largest enjoyment thereof, and must be observed and borne by all alike upon the broad ground that all have an equal right to travel in safety; and, when accidents happen as incidents to reasonable use and reasonable care, the law affords no redress.

4. ———: ———: ———. If the driver of an automobile sees that a horse driven to a carriage is restive and frightened, he should take such course to avoid inflicting an injury as the dictates of ordinary prudence may demand. He should reduce the speed of his vehicle, or stop it, if requested to do so, or if he sees that it is necessary to avoid an accident; but he is not relieved from the duty of exercising ordinary care to prevent injury to those he may meet or overtake upon the highway.

5. ——: ——: ——. The fact that a horse becomes frightened by an automobile upon the highway does not render the operator of such vehicle liable for resulting injury, as the horse has no paramount or exclusive right to the road; and the fact that a horse takes fright at a vehicle run by new and improved methods, and smashes things, does not of itself give the injured party a cause of action.

6. Appeal: QUESTIONS OF FACT. The rule is well established that, where there is a conflict of evidence upon the material facts touching the cause of action or defense, in an action at law, a reviewing court will not disturb the verdict of a jury or the findings and judgment of the trial court (*O'Chander v. Dakota County*, 90 Neb. 3); but, where a verdict is so clearly wrong as to induce the belief on the part of the reviewing court that it must have been found through passion, prejudice, mistake, or some means not apparent in the record, it will be set aside (*Garfield v. Hodges & Baldwin*, 90 Neb. 122), as, also, will the findings and judgment of the trial court, where they are clearly against the weight of evidence (*Roberts v. City of Lincoln*, 6 Neb. 352; *Southard v. Behrns*, 52 Neb. 486; *American Fire Ins. Co. v. Buckstaff Bros. Mfg. Co.*, 52 Neb. 676; *Symns Grocery Co. v. Snow Bros.*, 58 Neb. 516; *Frerking v. Thomas*, 64 Neb. 193).

APPEAL from the district court for Lancaster county: LINCOLN FROST, JUDGE. *Reversed.*

*Hall & Bishop,* for appellant.

*Charles O. Whedon,* contra.

HAMER, J.

This is an appeal by the defendant from the judgment of the district court for Lancaster county. The plaintiff brought an action to recover damages for personal injuries alleged to have been caused by the careless, negligent and unlawful manner in which the appellant, on the 19th day of July, 1908, ran, handled, and managed an automobile, so that, as alleged in the petition, it struck and overturned the carriage in which the plaintiff was then riding with her husband, son and daughter, and threw the plaintiff, with violence, out of said carriage

upon a paved street in the city of Lincoln, and against the iron inlet guard to the city sewer, severely lacerating the plaintiff's right ear and scalp and bruising and wounding her, and thereby causing her physical pain and mental suffering, and rendering her unable to perform her household duties, and putting her to expense in procuring medicines, physicians and nurses. The petition also alleged that the defendant was running said automobile on the left side of the street at the rate of more than 12 miles an hour, and that he gave no sound or warning as he approached the intersection of Eleventh and L streets, as required by rules 2 and 7 of the General Revised and Consolidated Ordinances and Special Ordinances of Lincoln, Nebraska, being a part of chapter 120 of said ordinances. The answer admits the collision, but alleges that the horse attached to the carriage was wild, fractious and unsafe, and that the driver, who was the appellee's son, was unable to manage and control him, and that the horse took fright and ran into the automobile at the intersection of Eleventh and L streets, in Lincoln, and that the automobile, which before that time had been running at a rate of speed not to exceed 3 or 4 miles an hour as it approached said intersection from the north on Eleventh street, being under a complete state of control, was at once slowed up and was standing still when run into by the plaintiff's horse and carriage, and that the horse and carriage left the car after running into it, and that the carriage upset a short distance east of the point of collision, and that the injuries resulting therefrom were caused by the wild and fractious character of the horse and the carelessness and negligence of the driver and his inability to handle and control the horse, and that the appellant used every care and precaution possible, and in no way contributed to the injuries; that the plaintiff, by reason of the vicious character of the horse and the carelessness and negligence of the driver, who was her son, and his inability to manage the horse, caused the injuries complained of. The reply was a general denial of new

matter in the answer. Appellant claims that the evidence fails to prove the cause of action, and attempts to show that the injuries sustained were so sustained because the horse was vicious and unmanageable, and because the plaintiff's driver was unable to control him. Errors at the trial are also alleged.

The horse and carriage were going east on L street at the time the automobile was going south on Eleventh street. The son of the appellant, who had gone to the depot for his mother, and who was driving the family horse and carriage, puts the horse and carriage, by his testimony, half way across Eleventh street at the time he first saw the automobile coming along Eleventh street from the north, and then distant from the carriage he was driving about 400 feet. He was driving on a trot. As Eleventh street is 70 feet between curbs, he had only 35 feet to drive, if he went on straight ahead towards the east, before he would be across Eleventh street and out of the way of the automobile going south. According to his statement, the automobile had more than ten times as far to go as the horse and buggy before it would collide with them if they went straight east across Eleventh street. The husband of the appellee corroborates the son as to the whipping of the horse by the son, and he, by his evidence, puts the horse and carriage about two-thirds of the way across Eleventh street when he first saw the automobile coming, and it was then distant from him about 250 feet, according to his opinion. The daughter of the appellee was riding in the carriage, at the time of the collision, with her brother, at the left of him and on the front seat, and the father and mother were in the back seat of the carriage. The daughter, by her testimony, puts the carriage two-thirds of the way across Eleventh street when she first saw the automobile, which was then in front of the grocery store referred to by the father in his testimony, and about 250 feet north.

Mrs. Roy Young lived at 310 South Eleventh street, over Pfeiff's grocery store, north of the point of collision,

and about one-half way between the alley and M street. She saw the automobile going south past her window. "Q. He was going at a moderate rate of speed, was he not? A. Well, very slow; not very fast. Q. He was going very slow? A. Yes, sir." If the right hind wheel of the carriage struck the automobile, this could have been done, it would seem, by the carriage turning and going northeast with its right hind wheel next to the automobile. The latter theory is supported by the testimony of De Vore, Spain, Mrs. Herpolsheimer, Mrs. Hoover and the defendant, Dr. Hoover. The defendant, Dr. Hoover, corroborated the statement of Mrs. Young as to the speed of the automobile. He testified that he turned on the brake and stopped the car before the collision occurred, and just as the horse started towards him. Before that he was running slowly. He says that if the horse, attached to the carriage, had gone straight across Eleventh street he would have missed the car by from six to ten feet, but that the horse turned south on Eleventh street, and "all at once the horse wheeled around and made a lunge and came down at an angle as though he was going to plunge right into the car, and, as he got right up close to the car, then he swung right around to the left, kind of doubled around the car, and struck the car; and I had brought my car to a standstill, when his carriage struck me, and, as I say, that he kind of swung around the car, and then ran on—the distance was probably 30 or 35 feet—and the horse started off then a little to the right, again to the south, and there the carriage, it seemed to me, collided with the curb, and the horse went down, and the carriage upset and spilled them all out there." This tends to show that the frightened horse was unmanageable, and that he attempted to, and probably did, go north, and in that way brought the right hind wheel of the carriage in contact with the automobile on the west side of the automobile, and then went around the automobile, perhaps behind it, and turned and went south to the southeast corner of the

intersection space of the two streets, where the carriage went down. It is in testimony that there were marks on the car.

Lottridge testified that the hind wheel of the buggy ran over the wheel of the automobile and that the buggy did not tip over until it struck the curbstone, which was about 35 feet from where it ran into the automobile. Leslie Keizer testified that when he first saw the automobile it was at the intersection of Eleventh and L streets, and going slow, and that the horse and buggy at first were going east on L street, and all at once the horse turned south on Eleventh street, and then that he turned around towards the automobile, and was going northeast at the time of the collision. He says that when the carriage struck the car it seemed to sway around to the south, and then hit the curb on the corner, and then the carriage turned over; that the right hind wheel of the carriage broke when it hit the curbing or basin. De Vore testified that the horse and carriage were going east on L street, and then that the horse turned south on Eleventh street, and then reared and turned around northeast towards the automobile as though he was going to run into it; that the appellant stopped the car, and the horse sprang around to the south; that the horse was rearing and plunging, and the carriage turned over, and the horse fell near the corner of Eleventh and L, and that the automobile was standing still when struck by the carriage; that the driver was trying to hold the horse, but did not have control of it, and that the horse was rearing and running. Mrs. Louise Herpolsheimer, the appellant's daughter, testified that she was in the automobile, and that the horse was going on a swift trot, and that as he reached the southwest corner of Eleventh and L he broke into a run; that the automobile had been slowed down, and that the car was stopped when the horse broke and ran, and that the horse seemed to run straight for the car, and that when the carriage struck the car it was standing still; that the horse then went to the southeast

corner, where he fell and the carriage upset; that the carriage did not upset when it struck the car; that the carriage struck the right front wheel of the car. The appellant's wife, Mrs. Della J. Hoover, testified that as the horse struck Eleventh street he made a turn as though going south, and then the driver suddenly lost control of him; that the husband slowed down the car, and that the carriage hit the car, and that the horse ran, with the driver trying to hold him; that when he reached the corner he fell, and the carriage went down.

The horse seems to have been badly frightened, and ran when he was whipped, and reared and plunged, and finally went down, and the carriage upset. The right side of the carriage and the automobile were brought together. That the right hind wheel of the carriage was injured and that there were marks on the right front wheel of the automobile tends to corroborate the testimony of the foregoing witnesses for the defendant as to the manner in which the injuries occurred. There is also testimony which tends to show that the horse was skittish and easily frightened, and it is shown that he had before been frightened by a street car which struck him, and the same buggy was overturned and the same woman was injured.

The weight of the evidence clearly shows that immediately upon the horse entering upon the intersection space of the two streets he started south on Eleventh street, apparently to avoid the automobile, then moving south, but the driver began whipping him, and apparently pulled him around until he faced the automobile, which was then northeast of him, and, as the whip was applied, the horse began to plunge and rear, and finally dashed by the automobile, probably on the west side and close enough to it so that the right wheel of the carriage came in contact with the right-hand front wheel of the automobile, and ran over it; the horse and carriage going around the automobile, probably behind it, and then going south 30 or 35 feet to the southeast corner of the intersection space, where the horse fell and the carriage went down and the

plaintiff was hurt. All the witnesses say the horse went
south immediately after entering Eleventh street, except
the Tylers; and nearly all, including the driver, say the
horse faced northeast towards the automobile immediately
before the collision.

The driver, Edward G. Tyler, testified: "I was going
northeasterly, would hit the alley back of the Odd Fellows
Hall." Lottridge testified that the horse got six or eight
feet into Eleventh street, "and made a little turn, as
though he was going south. Well, the man that was
driving pulled the horse back. That turned him down
this way, * * * down northeast, yes. Yes; that would
be northeast. Well, the automobile by that time came
along here, and the consequence was the buggy ran into
the automobile." Leslie Keizer testified: "Well, at first
the horse, it was going east on L street, and when it got
over by the little fountain it looked like it was going
straight across, and all of a sudden it turned. Q. Turned
which way? A. South; gave a short turn, and then turned
around again and swung over. Q. Towards the auto-
mobile? A. Towards the automobile. * * * Q. And
in which direction was the horse going at the time of the
collision? A. It was going northeast." J. S. De Vore
testified: "We were going south on Eleventh street, and
Mr. Tyler was on L street, coming into Eleventh, and as
the horse came into Eleventh he turned south; he was
going south, and then he reared up, and swung right
around, and came right kind of northeast, I should think
right towards the automomible, as though he was going
to run right onto it. * * * Q. The carriage struck
the front wheel of what? A. The automobile. Q. What
do you say happened to the carriage? A. That wheeled
the carriage to the front. The horse was rearing and
plunging, and fell down, just when they got over about
the corner of Eleventh and L, and then the carriage turned
over." A. J. Spain testified: "Well, I was standing on
the northeast corner next to the Odd Fellows Block, with
my little boy, and I saw the machine coming up Eleventh

street, and I also noticed a horse and buggy—a horse and carriage—coming east on L street, and I noticed the carriage as it came to the corner. I noticed the horse make a sort of a turn south. He was going south on Eleventh street. * * * Mr. Hoover turned the wheels of the automobile to the east in order to let the buggy slide by. * * * The buggy did not tip clear over until it struck the east side of the crossing or the curbstone, and I ran right to Mrs. Tyler, and I was the first one to her, excepting Mr. Tyler." Mrs. Herpolsheimer testified: "Well, we were going south on Eleventh, on the west side of the street. As we approached L street, we were going at a moderate rate of speed. As we approached L, the horse and carriage in question was seen coming from L, going east. * * * When the horse broke and ran, the car was stopped. The horse then made straight for it. When the horse and carriage struck the automobile, the automobile was still. The carriage was not upset. On the contrary, the horse then went on back to the southeast corner. There the horse fell right at the crossing, and ·the carriage with it, and they spilled out. * * * Q. What would you say as to the horse being scared or unmanageable? A. He was certainly frightened, and I think he must have been unmanageable, or he would not have come into the car. Q. What did the horse do just before he came to the car? A. Plunged. Q. I know; but what direction did he take? A. Northeast. Q. He did not jump into the car, did he? A. Well, he ran right for it. Q. I know, but what did he do when he got to the car? Where did he go with reference to the car? A. Why, he went right around the front end of the car, and a little bit to the north, and then, of course, they pulled him around the other way. Q. So that the horse missed the car? A. I don't think that the horse struck the car, but the carriage did. * * * Q. Which wheel of the automobile did the carriage collide with? A. The right-hand front wheel. That would be on the west side." Mrs. Della J. Hoover testified: "As we came up Eleventh street nearly to L—

I could not say just the distance—I noticed Mr. Tyler's carriage coming east,. and, as they struck Eleventh street, the horse made a little turn, as though he was going to go south.   My husband saw the horse there and the way he was doing, and really we though he was going south, and then he made a sudden turn.   It looked to me as though he was going south, and then he suddenly dashed around, and I think the horse—the young man lost control of it. * * *  My husband slowed the car down; and it came to me—it looked as though they were going to dash right into the car.   I was very much frightened.   Well, it came out, and they did strike us, and we had stopped.   They struck us, hit the car, and then the horse ran on.   The young man was holding on and trying to control him, and they went across the street to the corner.   They went several feet.   Now, I can't tell you how many feet; but they went over there.   The horse fell, the carriage went down, and the occupants were all spilled out, of course."   Dr. A. L. Hoover, the defendant, testified:   "The horse seemed to be excited, and I grabbed the lever of my car.  * * * I grabbed the lever so as to control my car, slowed it down, and watched what they were going to do, and as their horse came onto Eleventh street he turned south. He was going to turn south on Eleventh street, made quite a decided turn, and all at once the horse wheeled around and made a lunge and came down at an angle as though he was going to plunge right into the car; and, as he got right up close to the car, then he swung right around to the left, kind of doubled around the car, and struck the car, and ·I had brought my car to a standstill when his carriage struck me, and, as I say, that he kind of swung around the car, and then ran on.   The distance was probably 30 to 35 feet, and the horse started off then a little to the right, again to the south, and there the carriage, it seemed to me, collided with the curb, and the horse went down, and the carriage upset and spilled them all out there."

The great weight of the evidence is that the defendant

was proceeding slowly on Eleventh street, and that immediately after entering upon the intersection space of Eleventh and L streets he stopped his machine, which was standing still a little west of the center line of Eleventh street, with the front near the center line of L street, when the collision occurred. The machine was not in motion when the carriage collided with it. The horse was apparently badly frightened and was very unmanageable. The defendant contends that the cause of the collision and injuries was the unmanageable character and conduct of the horse, together with his driver's lack of skill and strength or judgment, and that he drove northeast towards the automobile, instead of keeping away from it, or he permitted the horse to go in that direction, and so the collision was brought about.

If equally capable men, carefully considering the evidence, may honestly differ as to the facts of the case, then it is one peculiarly adapted to the jury, and their verdict should stand, even though this court should unanimously conclude that a different verdict ought to have been reached, but is at the same time of the opinion that the verdict is not against the weight of the evidence. It may sometimes seem to be a narrow and uncertain line which determines the reviewing court to follow after the weight of evidence, instead of following that which seems to barely preponderate; but this line should at all times be visible to a discriminating and courageous court, willing to limit itself to its own proper province, and not to invade that field of inquiry which relates only to finding the facts by ascertaining a preponderance of the evidence, and which belongs, and should belong, exclusively to the jury. If a careful examination of the evidence shows that the material contentions of the plaintiff are clearly not sustained, the verdict and judgment cannot be right, and are therefore wrong, and the judgment should be set aside.

This court has recently said, in *O'Chander v. Dakota County*, 90 Neb. 3: "The rule is well established that

where, as in the case at bar, there is a conflict of evidence upon the material facts, touching the cause of action or defense, in an action at law, a reviewing court will not disturb the verdict of a jury or the findings and judgment of a trial court." And in *Smith v. McKay,* 90 Neb. 703, the first paragraph in the syllabus reads: "The finding of a jury on conflicting evidence will not be disturbed on appeal unless manifestly wrong." In *Kafka v. Union Stock Yards Co.,* 87 Neb. 331, this court adhered to the view that, " 'if different minds may reasonably draw different conclusions or inferences from the state of facts established by the evidence in a cause, whether such facts show negligence or contributory negligence is not a question of law for the court, but must be submitted to the jury. *Omaha Street R. Co. v. Lochneisen,* 40 Neb. 37, followed.' *Chicago, B. & Q. R. Co. v. Pollard,* 53 Neb. 729; *Shirley v. City of Minden,* 84 Neb. 544; *Hair v. Chicago, B. & Q. R. Co.,* 84 Neb. 398; *Crabtree v. Missouri P. R. Co.,* 86 Neb. 33." In *Kafka v. Union Stock Yards Co.* the opinion contains liberal quotations from the evidence taken, and shows that this court most carefully looked into the evidence to ascertain what the facts really were, and made its determination after it ascertained that there was clearly a conflict of the evidence on the material questions involved in the case. The opinion was delivered by Judge LETTON.

In *Garfield v. Hodges & Baldwin,* 90 Neb. 122, this court declared in the first paragraph of the syllabus: "A verdict so clearly wrong as to induce the belief on the part of the reviewing court that it must have been found through passion, prejudice, mistake, or some means not apparent in the record, will be set aside and a new trial ordered." That case originated in a tombstone business, where every man employed by the business seems to have been his own boss. There was a large stone, which was denominated A, and it was nearly evenly balanced upon a supporting stone with a sharp edge, and being steadied against the west side of a large post. Another stone, de-

nominated B and weighing about a ton, was placed on
top of the stone A.  There was nothing to prevent this
stone from toppling and falling to the west if only a small
amount of weight was placed on the west half of either
of said stones.  The deceased was in the employ of the
defendants, and in the course of his duties went to the
yard to get a stone weighing several tons, and denom-
inated C, and lying immediately south of and adjacent to
the two stones A and B.  The deceased and his brother
were lifting the stone C by means of a chain around the
same and attached to a traveling crane and a rope running
over a pulley.  Both were on the north side of C and im-
mediately west of A and B.  After C had been lifted to a
certain height, the deceased, to obtain a better hold upon
the rope, stepped upon the stones A and B, and they,
being in a balanced condition, were by his weight tipped
downwards to the west, and the upper stone sliding off
its blocks fell over and upon the deceased, crushing his
leg and inflicting injuries which caused his death.  Plain-
tiff claimed that the defendants permitted the two stones
A and B to remain in the dangerous condition set forth
for five or six weeks, and that the deceased was injured
through their negligence, and through no fault of his
own.  There was a failure to prove the specific acts al-
leged.  This court said: "When he went out that morn-
ing to get stone C, he went on his own initiative; he was
right beside and had a plain view of stone A; and, if stone
B was then resting upon stone A, the dangerous condition
of the two stones could be plainly seen by him.  *   *   *
The deceased was in duty bound to have noted their dan-
gerous condition and to have guarded against it.  *   *   *
He could not carelessly and negligently shut his eyes to
or ignore the dangerous situation which confronted him,
and charge the defendants with his own negligent act.
Having elected to proceed with his work in the face of the
dangerous situation or conditions from which his injury
resulted, we know of no theory upon which his adminis-
tratix can recover.  *   *   *  The rule is well settled in

this state that, where a verdict is so clearly wrong as to induce the belief on the part of the reviewing court that it must have been found through passion, prejudice, mistake, or some means not apparent in the record, it will be set aside and a new trial granted." In that case, Judge FAWCETT, delivering the opinion of this court, seems to have made a careful examination of the evidence, and the opinion shows, as does the opinion in the case of *Kafka v. Union Stock Yards Co., supra,* that this court will carefully analyze the testimony with a view to ascertaining whether there is a mere conflict of evidence, or whether the verdict and judgment are sustained by the evidence

In *Christensen v. Tate,* 87 Neb. 848, the question was whether the plaintiff should recover damages for personal injuries and for damage done to his horse and buggy because of the negligence of the defendant in driving his automobile along one of the streets of Fremont. In that case the defendant testified that he (the defendant) turned around a bill board while driving his machine, and, as he did so, he noticed the horse "looked up, as though he was going to be frightened," and that he then turned out into the ditch, and gave the plaintiff the full road, and stopped his machine, but the plaintiff denied that the defendant stopped his car at all. This court said, Judge SEDGWICK delivering the opinion: "It was fully shown by many witnesses that at the place of the meeting in question 10 or 12 miles an hour would be a highly dangerous rate of speed. In view of the fact that the defendant was a witness in his own behalf and did not testify as to the rate of speed he was driving when he met the plaintiff, we cannot say that the finding of the jury is unsupported by the evidence." In the syllabus, the sixth paragraph reads: "It is found upon examination of the record that the evidence is sufficient to support the verdict and judgment." The fair implication is that the reviewing court will look into the evidence, and, if there is simply a conflict of evidence, the verdict and judgment will be allowed to stand, but not where they are clearly against the weight of the evidence.

The automobile furnishes an improved method of travel. It is to be welcomed as a saver of time and a protection to man's favorite domestic animal, the horse, against long drives. It is said to be in use in all civilized countries, and it has come to stay. We are told that there are 750,000 automobiles in use in the United States alone. The law therefore does not denounce the use of an automobile on a public highway, and the appellant is not guilty of negligence because he used one on the streets of the city of Lincoln. It would be improper to say that the driver of a horse attached to a carriage has rights in the road superior to the rights of the driver of the automobile, as both have a right to go upon the public highway, and each is restricted in the exercise of his rights by the corresponding rights of the other, and each is entitled to regulate his use of the public streets and roads by observance of ordinary prudence under all circumstances. If the driver of an automobile sees that a horse driven to a carriage is restive and frightened, it would seem that he should take such course to avoid inflicting an injury as the dictates of ordinary prudence may demand. He should reduce the speed of his vehicle, or stop it, if requested to do so, or if he sees that this is necessary to avoid an accident. *Indiana Springs Co. v. Brown*, 165 Ind. 465, 1 L. R. A. n. s. 238; *Gue v. Wilson*, 87 S. Car. 144, 69 S. E. 99. In this case the defendant was not requested by the driver of the horse to stop, and therefore was not bound to do so, unless ordinary prudence required it; but he was not relieved from the duty of exercising ordinary care to prevent injury to the occupants of the carriage.

The restrictions which the law imposes upon all modes of travel upon the highways are such as tend to secure to the general public the largest enjoyment thereof, and must be observed and borne by all alike upon the broad ground that all have an equal right to travel in safety; and, when accidents happen as incidents to reasonable use and reasonable care, the law affords no redress. The fact that a horse becomes frightened by a motor vehicle

upon the highway does not render the operator of such vehicle liable for resulting injury, as the horse has no paramount or exclusive right to the road; and the fact that a horse takes fright at a vehicle run by a new and improved method, and smashes things, does not of itself give the injured party a cause of action. Davids, Law of Motor Vehicles, sec. 125.

In *Nason v. West*, 65 N. Y. Supp. 651, it is said, among other things: "Horses may take fright at conveyances that have become obsolete, as well as at those which are novel; but this is one of the dangers incident to the driving of horses, and the fact cannot be interposed as a barrier to retrogression or progress in the method of locomotion. Bicycles used to frighten horses, but no right of action accrued.  *  *  *  Electric street cars have caused many runaways. Automobiles operated without steam, by storage batteries or by gasoline explosive engines, running at a moderate speed, may cause fright to horses unused to them; yet the horses must get used to them, or the driver take his chances."

It is contended by the defendant that he was driving in his automobile at the rate of from four to six miles an hour, and that he slowed up as soon as the horse and carriage entered the intersection space of the two streets, and that he has been guilty of no negligence. A careful reading of all the evidence in the case compels us to find that the verdict is clearly against the weight of evidence. Our supreme court reports contain many hundred cases where the verdict and judgment have been set aside because of the insufficiency of the evidence. The most recent of these cases are *Rockwell v. State*, 90 Neb. 744; *In re Estate of Paisley*, 91 Neb. 139; *Bartels v. State*, 91 Neb. 575; *Carlos v. Hastings Independent Telephone Co.*, 91 Neb. 538; *Fitzgerald v. State*, 91 Neb. 481; *Gering v. Leyda*, 91 Neb. 430.

The seventh instruction given by the court upon its own motion reads: "If you determine from the evidence and under these instructions that the defendant was

negligent in one of the respects alleged in plaintiff's petition, as set out in the first paragraph of these instructions, and if you further determine from the evidence that the defendant's said negligence proximately contributed to the injuries of the plaintiff, then you should direct your attention, among other things, to the claim of the defendant that the plaintiff was guilty of contributory negligence, or, in other words, that the plaintiff by her negligence proximately contributed to the injuries done her.   Contributory negligence is a part of the defendant's case, and the burden of proof is upon the defendant, unless you find that plaintiff in making her own case has shown such contributory negligence, to prove by a preponderance of the evidence that the plaintiff was guilty of such contributory negligence.   In this particular, you are further instructed that if the horse which, at the time of the accident, was being driven by plaintiff's son was a fractious, dangerous and unsafe animal, and that the plaintiff's injuries were proximately caused, even in part, because of that fact, then that would constitute contributory negligence on the plaintiff's part.   On the other hand, any negligence of plaintiff's son in the management of the horse would not constitute negligence on the plaintiff's part, and she would not be responsible therefor.   In any event, if you find that plaintiff was guilty of contributory negligence, which proximately contributed to her injuries, she cannot recover in this action."

The jury must have been misled by the following sentence contained in the instruction above quoted: "On the other hand, any negligence of plaintiff's son in the management of the horse would not constitute negligence on the plaintiff's part, and she would not be responsible therefor."   The foregoing sentence would seem to be clearly wrong and misleading and in a high degree prejudicial to the defendant.   The plaintiff's son, with plaintiff's consent, was driving the family horse and carriage.   All the members of the family were with him.   Presumably he was driving as the plaintiff and her husband desired him

to drive, because they were with him. If the plaintiff had herself driven the horse and buggy in such a negligent and careless way as to bring about the collision and the injury, she would be the direct cause of the injuries suffered, and she could not recover damages because of her own carelessness and negligence. The plaintiff's son, for the time being, was the plaintiff's servant. He had gone to her stable and got out the family horse and buggy to bring her from the railroad station. It was her journey that was being made. It was made by her by and with the assistance of her son and husband. Suppose that she herself had driven the horse and buggy against the automobile, and that the horse then turned and ran until it fell, would it be possible under these circumstances that anybody could seriously think that she ought to recover for her carelessness, negligence or inability to control a fractious or an exceedingly timid horse? The all-important question to be determined is: Who is to blame for the collision and injuries which are the direct result thereof? If the thing which happened would not have happened except for what the plaintiff did through her son, then she certainly cannot recover. What her son did must be attributed to her, because he was her servant or agent, and it is immaterial which he was. The plaintiff was herself guilty of negligence, and therefore should not recover. *Hajsek v. Chicago, B. & Q. R. Co.*, 5 Neb. (Unof.) 67; *Aurelius v. Lake Erie & W. R. Co.*, 19 Ind. App. 584; *Cunningham v. City of Thief River Falls*, 84 Minn. 21; *Wosika v. St. Paul City R. Co.*, 80 Minn. 364; *Donnelly v. Brooklyn City R. Co.*, 109 N. Y. 16; *Brickell v. New York C. & H. R. R. Co.*, 120 N. Y. 290; *Chicago Union Traction Co. v. Leach*, 215 Ill. 184; Beach, Contributory Negligence (3d ed.) sec. 115.

If the plaintiff's son drove into the automobile of defendant, then the defendant is not liable, because he is not responsible for the collision. There is no liability of the defendant, whether the act done is regarded as the act of the plaintiff or the act of her son. She cannot be held

free from responsibility for the negligence .of the driver, and the instruction is most misleading. *Koplitz v. City of St. Paul,* 86 Minn. 373; *Cunningham v. City of Thief River Falls,* 84 Minn. 21; *Wosika v. St. Paul City R. Co.,* 80 Minn. 364; *Town of Knightstown v. Musgrove,* 116 Ind. 121; *Kessler v. Brooklyn Heights R. Co.,* 3 App. Div. (N. Y.) 426; Beach, Contributory Negligence (3d ed.) sec. 115*a;* 29 Cyc. 543.

It is urged by appellant that the verdict is the product of bias and prejudice upon the part of the jury, and in support thereof it is stated that it appears from the affidavits of three of the jurors that they understood from the remarks of the court, urging the jury to agree upon a verdict, if possible, and from the conduct of the attorneys of the respective parties, whom the trial judge called to his desk, and with whom he held a private consultation, that it was the desire, both of the court and the attorneys, that there should be no disagreement, and that a verdict of some kind should be returned, and therefore, solely by reason of that fact, they consented to join in the verdict rendered; that they would not have done so but for the reason that they were influenced by the remarks of the court and what took place between the court and the attorneys. We do not pass upon this question, because compelled to grant a new trial for the reasons above specified.

The judgment of the district court is

REVERSED.

SEDGWICK, J.

I concur in the result reversing the judgment.

FAWCETT, J., concurring in part.

I concur in so much of the opinion as holds that the evidence does not establish negligence on the part of defendant. This being true, there is no question of contributory negligence in the case. There cannot be such a thing as contributory negligence by one party where there is no negligence by the other.

LETTON, J., concurring in part.

I concur in the view that the judgment should be reversed as unsupported by the evidence. It is my view, however, that the duties of the driver of a motor vehicle with respect to meeting or passing horse-drawn vehicles are laid down in sections 6235, 6236, Ann. St. 1911 (Comp. St. 1911, ch. 78, secs. 146, 147), and that, unless the accident is caused in some other manner than by a violation of these rules, the court is bound by the police regulations established by the legislature and should adhere to the same. As to other points decided I express no opinion.

ROSE, J., dissenting.

It seems to me there is sufficient evidence of defendant's negligence to justify the action of the trial court in submitting that issue to the jury. I do not concur in the reversal for any reason given in the opinion, and therefore dissent.

REESE, C. J., dissenting.

The evidence in this case is conflicting, although seemingly preponderating in favor of defendant. It is my view that the question of the weight of the testimony is for consideration and decision by the trial jury, and not for this court. While, had I been called upon to determine the case upon the preponderance of the evidence, I probably could not have agreed to the verdict, it is the well-settled law that in such cases the verdict of a trial jury should close the inquiry.