JOSEPH E. FREDERICKS, APPELLEE, v. CHICAGO & NORTH-
WESTERN RAILWAY COMPANY, APPELLANT.

FILED APRIL 17, 1914.  No. 17,552.

1. MASTER AND SERVANT: INJURY TO SERVANT: LIABILITY OF MASTER.
Where a brakeman on a freight train, without the knowledge or con-
sent of his master and in violation of its known rules, in the absence
of the engineer, takes possession of the engine and runs and operates
the same in switching cars in the master's yard, and while so engaged
his fellow brakeman is injured, the master cannot be held liable for
such injury, even though the injured servant may not have known
that the engine was being operated by his unauthorized fellow brake-
man.

2. Appeal: REVERSAL. ''A verdict so clearly wrong as to induce the
belief on the part of the reviewing court that it must have been found
through passion, prejudice, mistake, or some means not apparent
in the record, will be set aside and a new trial awarded.'' *Garfield
v. Hodges & Baldwin*, 90 Neb. 122.

APPEAL from the district court for Holt county:
WILLIAM H. WESTOVER, JUDGE. *Reversed.*

*A. A. McLaughlin, Edgar R. Hart* and *Wymer Dressler.*
for appellant.

*M. F. Harrington, contra.*

FAWCETT, J.

Appeal by defendant from a judgment of the district
court for Holt county, in favor of plaintiff, for personal
injuries.

Plaintiff was a brakeman on a freight train of defend-
ant. The train on which he was employed left Norfolk,
in this state, and was bound for Missouri Valley, in the
state of Iowa. The briefs filed are quite voluminous. They
argue a number of questions, notably the question as to
whether or not the work, in which plaintiff was engaged
at the time he received his injury, was interstate or intra-
state business. The question is an interesting one, and,
were it at all necessary in the determination of this case,

we would gladly consider the able briefs presented upon
that point. We find it unnecessary to consider any of the
questions, however, for the reason that we are met at the
very threshold of the case with the contention of defend-
ant that the evidence fails to show any negligence on its
part. This question being decisive of the case, we shall
consider it and no others.

The evidence shows that the train reached West Point
at about 5:20 in the evening. When it arrived there,
some empty flat cars, used as gravel cars, were standing
upon the main line. The crew of the freight train switched
those cars onto a side-track and then ran their own train
upon another side-track. On account of a strong wind
that had been blowing, the engine was found to be short
of coal. By reason of that fact the engine was detached
from the train, and the engineer, fireman and conductor
ran it to Scribner, for the purpose of coaling. While they
were gone, plaintiff and the other brakeman, Uecker, ate
their supper. The engine returned from Scribner, accord-
ing to the testimony of plaintiff, "between 6:30 and 7
o'clock," when it was headed in on the track where the
train was standing and coupled on to the caboose. Up to
this point there is no conflict in the evidence. After the
engine had been coupled on to the caboose, the overwhelm-
ing weight of the evidence is that the engineer, fireman
and conductor all left the train and went to a hotel or
eating house, where, together they ate their supper. While
they were eating supper, the plaintiff and his fellow brake-
man, Uecker, without any instructions or permission from
either the conductor or engineer, uncoupled the engine
from the caboose, ran it over onto another side-track, and
proceeded to the switching of certain cars; Uecker run-
ning the engine and plaintiff acting as brakeman. While
they were engaged in this unauthorized work, plaintiff
undertook to climb down from a flat car as they were ap-
proaching a switch, for the purpose of manipulating the
switch when it was reached. In so doing he took hold of
a stake which was one of a number of stakes upon the
flat car resting in sockets and used for the purpose of

supporting the sideboards of the car when being filled with gravel, or other ballasting material. He took hold of this stake for the purpose of supporting or steadying himself while resting his foot, or possibly both feet, upon the journal, or "oil house," as it is termed by the conductor, so as to be ready to drop from the car when they reached the switch. The stake either broke or slipped out of the socket, causing plaintiff to fall and to receive the injury for which he seeks to recover. It is conclusively established that the engineer, fireman and conductor had gone to supper and had not returned to the train at the time plaintiff and Uecker commenced their independent switching, or at the time of the injury. Uecker testified that he and plaintiff engaged in this independent work at the suggestion of plaintiff. Plaintiff denied this, and testifies upon his direct examination that the engineer was on the engine at the time; but upon cross-examination he says he does not know who was on the engine. He and Uecker both agree that they were in the caboose together at the time they decided to do the switching referred to.

Plaintiff testified, on cross-examination, that he was taking his orders from Uecker; "he told me what to do." Previous to that, on direct examination, he had testified: "Q. Is five (the freight train) a freight or passenger train? A. Passenger train. Q. Who give you directions what to do? A. My superior officer. Q. Who was he? A. The conductor. Q. What is his name? A. Dorsey." On his direct examination he was asked: "Q. What did the engineer do? A. He was on the engine." On cross-examination he was asked: "Q. When this moving of the train was going on, where was the engineer? A. Well, he was sixteen carlengths from me. Q. Well, he was on the engine, was he not? A. Supposed to be; it was around a curve. Q. Do you know whether he was or not? A. No, sir; I do not; I think he was." Further on in the cross-examination he was asked: "Q. Did you see the conductor or engineer or fireman after they came back from Scribner before you got hurt? A. Yes, sir. Q. Where did you see them? A. Why, Conductor Dorsey

went over to the depot; they all went over there. Q.
You saw them going over? What did they go there for?
A. Going over there, I suppose Dorsey was going to re-
port. Q. You were then in the way car? A. Yes, sir.
Q. And it was then standing on the passing track? A.
Yes, sir. Q. Where was the engine standing? A. The
engine was then headed in on the way car. Q. How far
away? A. Coupled right on. Q. Did you couple that
engine on to that way car? A. Yes, sir." He was then
asked: "Q. Now, after the engine was coupled on to the
way car, did you see the engineer and fireman go over
toward the depot? A. I saw Dorsey, and I think the fire-
man. Q. You saw Dorsey and the fireman? A. Yes, sir.
Q. Was the engineer with them? A. No, sir. Q. Where
was French (the engineer) then? A. I don't know, I
went down to make this cut, cut off these cars. I started
up along the track to make the cut. Q. Who told you
to do that? A. Heine Uecker. Q. Where was he at that
time? A. He was in the caboose cleaning lamps." He
was further interrogated about a statement he had made
to a representative of the defendant, after he had received
his injury, as follows: "Q. Did you know at that time,
when Mr. Hunter was there and you made that statement,
that this engine which was moving this train wasn't being
operated by the engineer at all at the time you were hurt?
A. No, sir. Q. You did know that the brakeman had no
business or authority to be running an engine at all, didn't
you? A. I don't think that he has. Q. And you don't
think that a brakeman ought to be engaged in cutting out
cars and moving the train over switches and on the track
if the engineer and fireman are both absent from the en-
gine? A. No, sir."

We have then this situation: It is clear, beyond pos-
sible contradiction, that neither the engineer nor fireman
was on the engine at the time plaintiff was injured; that
neither the engineer, fireman nor conductor was on or
near the engine when it was taken by plaintiff and Uecker
to do the switching referred to. Plaintiff has shown his
own unreliability as a witness by testifying at first in posi-

tive terms that the engineer was on the engine at the time, and subsequently admitting that he did not know whether he was or not. In fact, his testimony upon every material point in the case—in relation to the whereabouts of the engineer, in relation to the condition of the stake, and in relation to the questions as to whether or not the car was equipped with a grab iron—is too incredible to entitle him to belief. But, it is argued by his counsel that the jury are the judges of the credibility of witnesses and of the weight to be given their testimony; that the jury saw the witnesses upon the stand and had a right to take into consideration the circumstances under which they were testifying and their interest in the result of the suit; intimating that defendant's witnesses were employees of the railroad company and were therefore interested in protecting the interests of their employer. We concede, as a general proposition, that a jury has a right to take such matters into consideration, but there should be offset against that the direct and decided pecuniary interest of the plaintiff in the result of an action of this character. The courts of the country have gone a long way in sustaining the rule that the jury are the judges of the credibility of the witnesses and the weight of the evidence, but cases sometimes arise, like the one we are now considering, when to apply that rule would be a travesty upon justice. The other well-established rule that a plaintiff must establish his case by a preponderance of the evidence should not be entirely lost sight of even in an action for personal injuries; however much the plaintiff's unfortunate plight may appeal to the sympathy of the court. The evidence in this case is so clear that plaintiff's injury was not the result of any negligence on the part of defendant that there is no room for disagreement by unprejudiced minds.

The plaintiff admits that a brakeman ought not to be engaged in cutting out cars and moving a train over switches, if the engineer and fireman are both absent from the engine, and the undisputed proof shows, not only that the engineer did not authorize Uecker to run the engine, but that he had no authority to order him to do so. This

being true, plaintiff and Uecker were doing work entirely outside of the scope of their employment and in defiance of the known rules of their employer. That plaintiff knew they were doing the work in that manner is to our minds clear; but, even if he did not know that Uecker was running the engine, he, knowing that the fireman was away from the engine, knew enough to put him upon inquiry as to who was, in fact, running the engine. If he failed to make that inquiry, he proceeded with the work at his own risk. Indeed, we think the rule is even stronger than that. We think it is immaterial whether he knew or did not know who was running the engine. The defendant was not guilty of negligence, nor could it be held to have invited plaintiff to proceed with the braking, if, in fact, the engine was at the time being run by an interloper. The fact that Uecker was a brakeman on the train did not give him any right to take charge of the engine, without the knowledge and consent of his employer, and proceed to run it. When he did so he was as much an interloper as if he had been a "hobo," stealing a ride, and the defendant can no more be held responsible for his act than it could be for the act of any stranger. It needs no argument to convince even a layman that the defendant would never have considered for a moment permitting one of its brakemen to operate one of its engines on any part of its railroad, and especially over and across the street intersections of a city.

Two servants are employed for the sole purpose of keeping a master's automobiles clean and supplied with oil and gasoline, neither of whom has authority from the master to run one of the engines, but, on the contrary, both are prohibited by the terms of their employment from so doing. Suppose, without the knowledge of his master, one of these servants takes an automobile out of the garage and while running it runs down his fellow servant. Can the master be held liable for an injury caused by his machine while it is being so used, even though the servant injured did not know that the machine was being run by his unauthorized fellow servant? Assuredly not. And suppose,

further, that it was a part of the first servant's duties to go to the store for oil and gasoline when needed, and that it was the duty of the chauffeur when called upon to take the servant to the store for that purpose.  Would that change the rule so as to make the master liable for the unauthorized acts of his servant?  Again, we say, assuredly not.  We are unable to see why the rule should not be the same in the case at bar.

By instruction No. 2, requested by defendant, the court charged the jury: "I instruct you that if you find from the evidence that at the time of the injury to the plaintiff, complained of by him, the plaintiff's fellow brakeman, Uecker, was with the plaintiff's knowledge or by an agreement made by and between the plaintiff and Uecker that he (Uecker), should go upon, run, operate and move the engine, and the plaintiff do the switching, and that while the switching was being so done the plaintiff was injured, then I instruct you that the plaintiff cannot recover, and your verdict must be for the defendant."  This instruction was as favorable to plaintiff as he had any right to expect.  It told the jury in plain terms that, if they found from the evidence that Uecker was, with the plaintiff's knowledge, operating and moving the engine while plaintiff was doing the switching, plaintiff could not recover, and they should return their verdict for the defendant. This instruction the jury disregarded.  As we read and examine this record, it leaves no room for doubt that, to say the least, plaintiff knew that Uecker was running the engine at the time he received his injuries.  Even by his changed testimony on cross-examination he admits that he saw the fireman and conductor leave the train. He therefore knew that the fireman was not upon the engine, and it would take direct proof to make us believe, or to cause us to approve a finding that an experienced engineer, such as French is shown to have been, would run his engine over and across the streets of a city, switching cars from one track to another, without the fireman on the engine, not only to do the firing but to ring the bell.  It is

96 Neb. 3

taxing our credulity too much to ask us to believe such a statement. It is evident that the verdict in this case "must have been found through passion, prejudice, mistake, or some means not apparent in the record." In such a case we have held that the verdict of the jury "will be set aside and a new trial awarded." *Garfield v. Hodges & Baldwin,* 90 Neb. 122; reaffirmed in *Tyler v. Hoover,* 92 Neb. 221.

For the reasons above given, the judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED.

BARNES, ROSE and SEDGWICK, JJ., not sitting.